UNITED STATES, Appellee

v.

WILLIAM H. CROMARTIE, Private, U. S. Army, Appellant

1 USCMA 551, 4 CMR 143

No. 374

Decided August 6, 1952

LT. COL. James C. Hamilton, USA, and 1ST LT. James A. Hagan, USA, for Appellant.

LT. COL. Paul J. Leahy, USA, and 1ST LT. Richard L. Brown, USA, for Appellee.

Opinion of the Court

PAUL W. BROSMAN, Judge:

I

This case is before us on petition for review granted March 3, 1952. Petitioner was tried by general court-martial in Taegu, Korea, on July 28, 1951, for wrongful possession of marihuana, in violation of Article of War 96, 10 USC § 1568; and under a specification alleging a violation of Article of War 93, 10 USC § 1565, which will hereafter be set out in detail. The court-martial found him guilty under both charges, and sentenced him to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined at hard labor for five years. The convening authority approved, and a board of review in the office of The Judge Advocate General, United States Army, affirmed without opinion. Our grant of review was limited to two issues, (1) Whether the instructions on the elements of the offense alleged in the specification of Charge I were sufficient, and (2) Whether the evidence of record as to such specification reasonably required the law officer to instruct as to lesser included offenses.

II

On the morning of March 19, 1951, petitioner sought out Agent Jack F. Stuart, of the Criminal Investigation Division, for the purpose of discussing with him a personal difference regarding the arrest and confinement of a woman friend of the accused. Stuart suggested that the two men talk the matter over in his office. In the course of conversation, the Agent observed that the accused wore a .45 calibre pistol, carried with hammer cocked in a shoulder holster. Stuart informed petitioner that he must surrender the weapon before entering the office. Thereupon petitioner thrust Stuart away, drew the pistol from its holster, threw the slide so as to place a round in the chamber, and pointed it at Agent Stuart's stomach. At this same time petitioner told Stuart that he would not submit to being disarmed. Stuart withdrew for approximately two paces, eyed petitioner for several seconds, and thereafter reached for his own pistol. Thereupon petitioner turned and fled. Stuart engaged in pursuit for a brief period, lost the trail in an alley, and petitioner was apprehended by another Criminal Investigation Division Agent

shortly thereafter. Following a search of his person, a package wrapped in a Korean newspaper and containing a green vegetable substance was found in petitioner's overcoat pocket. Upon subsequent chemical analysis the substance was found to be marihuana. After having been duly warned of his rights, petitioner made an oral statement to Agent Cline, a third Criminal Investigation Division operative, in which he stated that he had drawn his pistol only to frighten Agent Stuart, and because he did not wish to be found with marihuana in his possession. During the testimony of Agent Stuart it was developed that all military personnel of the area in which the present incident occurred were required by regulation to carry pistols, or other appropriate weapons. Petitioner testified under oath that he suffered a complete amnesia during the period here involved, and remembers nothing of the events with which his trial was concerned.

While the offenses in this case were committed while the Manual for Courts-Martial, U. S. Army, 1949, remained in effect, and the accused was charged with violations of the Articles of War, the hearing was held subsequent to May 31, 1951. Accordingly, the provisions of the Uniform Code of Military Justice and of the Manual for Courts-Martial, United States, 1951, governed the conduct of the trial.

### III

The issue upon which we shall determine this case questions the sufficiency of the law officer's instruc- █ tions as to the elements of the offense charged under Article of War 93, supra. That Article provides in pertinent part that:

"Any person subject to military law who commits . . . assault with intent to do bodily harm with a dangerous weapon, instrument, or thing, or assault with intent to do bodily harm, shall be punished as a court-martial may direct."

The specification in question appears in the record in the following form:

"In that Private William H. Cromartie, Company C, 811th Engineer Aviation Battalion, did, at Taegu, Korea, on or about 19 March 1951, with intent to do him bodily harm, commit an assault upon Jack F. Stuart, by drawing and pointing a loaded pistol at him."

At the outset we recognize that this specification does not follow identically in form either of the 1949 Manual's sample specifications embodying the elements of the two offenses denounced in Article of War 93, as quoted in part above. See Manual for Courts-Martial, U. S. Army, 1949, Appendix 4, Specifications Nos 96 and 97, page 324. Sample Specification No 96 relates to assault with intent to commit a felony, or to do bodily harm, and uses the words "feloniously and willfully." Petitioner was not charged in these terms, and other language not found in the sample appears in the specification in question. We are inclined to believe that the offense alleged against petitioner must be regarded as something other than assault with intent to do bodily harm. Sample Specification No 97, pertaining to assault with intent to do bodily harm with a dangerous weapon, on the other hand, indicates the necessity for affirmative or positive action on the part of an accused in committing the alleged assault, such as "shooting," "striking," or "cutting," with a dangerous weapon, such as a "pistol," "pickax," or "bayonet." However, the entire tenor of the record, including the sentence imposed, and arguments used both at the trial and on appeal, indicates the view that petitioner was charged with and found guilty of the commission of an assault with intent to do bodily harm with a dangerous weapon, instrument, or thing. We shall act on this assumption for the purposes of the present opinion.

The law officer at the trial instructed the court-martial that:

"The court is advised that the elements of the offenses are as follows: as to Charge I—that the accused assaulted a certain person with a certain weapon, instrument, or thing;

**553**

and facts and circumstances indicating that the weapon, instrument, or thing was used in a manner likely to produce death or great bodily harm.

"Weapons and other objects are dangerous when they are used in such a manner that they are likely to produce death or great bodily harm."

Petitioner argues that these instructions are fatally defective in that the court-martial was not advised that a specific intent to inflict bodily harm is a necessary ingredient of the offense alleged, and he further urges that a mere reading of the subparagraph "Proof" in the Manual treatment of the offense charged certainly does not constitute compliance with the mandatory provisions of the Uniform Code of Military Justice, Article 51, 50 USC § 626, unless the text so read embraces all elements of the crime. With the latter assertion of appellate defense counsel we are in full accord. It is certain that the law officer in this case did not explicitly instruct the members of the court-martial on the necessity for a finding of intent on the part of petitioner to inflict bodily injury on Agent Stuart. It remains to inquire whether a specific intent to do bodily harm is an essential ingredient of the offense here charged—that is, of assault with intent to do bodily harm with a dangerous weapon, instrument, or thing.

Had the accused been charged merely with assault with intent to do bodily harm, there would have been no doubt in the matter. In its discussion of this crime, the Manual for Courts-Martial, U. S. Army, 1949, paragraph 180m, uses the language set out below:

"This is an assault aggravated by *the specific present intent to do bodily harm* to the person assaulted by means of the force employed. It is not necessary that any battery actually follow, or if bodily harm is actually inflicted, that it be of the kind *intended*. . . . ." [Emphasis supplied]

That a specific intent is an essential element of this offense is fully supported by civilian legal writers. In Clark and Marshall, A Treatise on the Law

of Crimes, 4th ed, §§ 201, 202, page 253, the matter is put this way:

"An assault with intent to kill, *to do great bodily harm,* to rape, to rob, etc., is called an aggravated assault, as distinguished from a common assault, because the assault is aggravated by the concurrence of *the felonious intent* with which it is made.

. . . .

"To constitute an assault with intent to murder, to kill, to rob, to rape, to do great bodily harm, etc., *the specific intent is essential.* . . . ." [Emphasis supplied]

and as follows in Miller, Handbook of Criminal Law, § 100, pages 309, 310:

". . . . Aggravated assaults, as the name suggests, are those which are accompanied by circumstances of aggravation; such as assaults with intent to kill, to rape, or *to inflict serious bodily injury.* . . . . To constitute these crimes, *the specific intent is absolutely essential.* A man cannot be convicted of an assault with intent to kill unless it is shown that he intended to kill. . . . ." [Emphasis supplied]

A specific intent is likewise an element of the military offenses of assault with intent to murder, to commit manslaughter, to commit rape, to rob, and to commit sodomy—and this is made explicit under the appropriate Manual subparagraph "Proof." See Manual for Courts-Martial, supra, paragraph 180k, page 247. True it is that no specific intent is required in the additional military offense of assault with a dangerous weapon. However, the accused is here charged with an assault *with intent to do bodily harm* with a dangerous weapon. The very title of this latter offense, as it appears in both the Articles of War, supra, and the 1949 Manual, indicates clearly the necessity for the establishment of specific intent. Indeed, numerous service cases have either held or manifestly implied to this effect. United States v. Stock, 3 CMR(AF) 368, 384, 385; United States v. Johnson, 18 BR 269; United States v. Yaple, 9 BR 143; Dig Op JAG Army, 1912–40,

§ 451(8), page 313. Moreover, in that limited number of American jurisdictions in which the present offense exists by statute, it is fully recognized that a specific intent must be shown. State v. Barkas, 91 Utah 574, 65 P2d 1130; State v. Potello, 42 Utah 396, 132 P 14; People v. McCoy, 25 Cal2d 177, 153 P2d 315; People v. Makin, 8 Cal 547; People v. Hopper, 69 Colo 124, 169 P 152; People v. Stoyan, 280 Ill 300, 117 NE 464; Borders v. State, 81 Tex Cr 43, 193 SW 148; In re Burns, 113 Fed 987 (CC, Arkansas). We conclude that such an intent *is* an ingredient of the offense with which the accused here was charged.

A comparison of the law officer's instructions on the crime alleged, set out earlier herein, with the language of the Manual for Courts-Martial, supra, paragraph 180*l*, subparagraphs "Discussion" and "Proof," page 247, discloses that the former consisted solely of a quotation of the entire contents of subparagraph "Proof," plus those of the first sentence of subparagraph "Discussion." It simply cannot be denied that the Manual treatment of this offense in its Chapter XXIX "Punitive Articles" is inadequate for the purpose to which it was put by the law officer in this case. This insufficiency is doubtless due to understandable considerations to which we adverted recently in the following language used in United States v. Hemp (No. 290), 1 USCMA 280, 3 CMR 14, decided April 8, 1952:

". . . . The confusion and uncertainty which we find evidenced in some of the cases appealed to this Court on this subject are understandable, and arise out of the changes in procedure required under the Uniform Code of Military Justice, 50 USC §§ 551–736. Difficulties can be expected when the offense was committed at a time when the old code was in effect, and yet must be tried under the new rules. The 1949 Manual for Courts-Martial, U. S. Air Force, was prepared at a time when it was not contemplated that law officers would be required to instruct the members of the courts-martial as to the elements of the offense, and it is not a model for that purpose. It is

to be hoped that when the old enactment and Manual are out of use, the Code and present Manual, and the principles enunciated by this Court, will eliminate much of the uncertainty being encountered in complying with the requirement that instructions on the elements of offenses be given."

However, we cannot believe that these facts relieved the law officer of his obligation to "instruct the court as to the elements of the offense." See Uniform Code of Military Justice, Article 51(c), 50 USC § 626; United States v. Drew (No. 422), 1 USCMA 471, 4 CMR 63, decided July 23, 1952. On this subject we had the following to say in another case decided not long since, United States v. Williams (No. 251), 1 USCMA 331, 2 CMR 137, decided March 14, 1952:

". . . Apparently, law officers have not given due consideration to defining the crime accurately. Too much attention is being placed on the wording of the Manual to the effect that the instruction may be given in the language of the applicable subparagraph. That requirement is permissive, and in certain instances the contents may be adequate to present fairly the material issues. However, there are offenses which are not sufficiently defined and the elements must be obtained from the punitive article or from some other sources. The 'Discussion' and 'Proof' contained in the Manual quite often make general statements in reference to the crime, without specifically pointing out the particular and necessary elements, and in many instances the remarks include statements which are not fitted to the issue involved. Some discretion is required to extract from both the 'Discussion' and 'Proof' the essential elements of the offense or offenses shown by the evidence, and law officers should make certain that those necessary to a proper definition of the crimes are called to the attention of the courts-martial members."

IV

It has been argued, however, that despite a relative want of clarity, the

**555**

Manual's treatment of the offense in subparagraphs "Discussion" and "Proof," paragraph 180l, supra, safely meets minimal standards through obvious implications from language used therein. Thus, for example, it is suggested that any weapon, which, when used in the manner contemplated by its design and construction, is apt to produce death or great bodily harm, is per se, a dangerous weapon. The use of a loaded pistol as a firearm is, of course, an illustration of this notion. Further, if an assailant uses such a weapon or instrument, dangerous per se, in such a manner as to evince objectively a purpose to injure another, an inference necessarily arises that he *intends* bodily harm—regardless of the seriousness of the resulting injury, or even whether physical harm actually occurs. Accordingly, the provisions of paragraph 180l involve a recognition of the presence of intent as a component of the offense here charged. Likewise, an instruction based thereon does, perhaps circuitously and elliptically, but nonetheless genuinely, inform the court-martial of the necessity for a finding of this element— particularly when considered against a background of the title of the offense involved and the language of the relevant specification.

We cannot possibly accept this position. Indeed, it appears to alter completely the essential nature of the offense under consideration, and to render indistinct, if not to erase, the distinction under the Articles of War and the 1949 Manual between this crime and that of assault with a dangerous weapon. However, conceding arguendo a touch of virtue to the argument, it is regarded as inappropriate here for failure of the law officer to include within his charge the final two sentences of paragraph 180l, supra, subparagraph "Discussion," as follows:

". . . The mere fact that a weapon is susceptible of being so used is not enough. Boiling water may be so used as to be a dangerous thing, and a pistol may be so used as not to be a dangerous weapon."

The proffered theory would seem certainly to demand that members of the

556

court be informed of the contents of the only portion of the Manual's treatment of the offense charged omitted from the instruction as given at the trial—this because of its important bearing on both the question of intent and that of the dangerous character of the weapon used. Without this language the instruction is incomplete and distinctly misleading.

## V

Although the law officer's neglect is comprehensible, he did in fact omit all reference to what is perhaps the crucial element of the aggravated assault alleged. In several recent instances we have had occasion to consider the effect of failure to instruct concerning the essential elements of an offense. We have held that the provisions of Article 51(c), supra, are mandatory, that they grant to an accused a substantial right, and that failure to follow the Code's mandate in this particular, when a plea of not guilty has been entered, is an error which materially prejudices the substantial rights of the accused and requires reversal. United States v. Lucas (No. 7), 1 USCMA 19, 1 CMR 19, decided November 8, 1951; United States v. Clay (No. 49), 1 USCMA 74, 1 CMR 74, decided November 27, 1951; United States v. Rhoden (No. 153), 1 USCMA 193, 2 CMR 99, decided February 26, 1952. In a per curiam opinion in the case of United States v. James (No. 551), 1 USCMA 379, 3 CMR 113 decided May 8, 1952, we held that:

". . . The most serious of the errors committed was the failure of the president to instruct the court on the elements of the offense to which petitioner pleaded not guilty. This alone requires reversal. United States v. Clay, No. 49), 1 USCMA 74, 1 CMR 74, decided November 27, 1951. . . ."

Moreover, it is a well-settled rule of law that the absence of an objection at trial to the failure to instruct does not bar consideration of the error on appeal. In the leading case of Screws v. United States, 325 US 91, 107, 89 L ed 1495, 65 S Ct 1031, 162 ALR 1330, the Supreme Court of the United States declared:

"It is true that no exception was taken to the trial court's charge. Normally we would under those circumstances not take note of the error. See Johnson v. United States, 318 U.S. 189, 200. But there are exceptions to that rule. United States v. Atkinson, 297 U.S. 157, 160; Clyatt v. United States, 197 U.S. 207, 221–222. And where the error is so fundamental as not to submit to the jury the essential ingredients of the only offense on which the conviction could rest, we think it is necessary to take note of it on our own motion. Even those guilty of the most heinous offenses are entitled to a fair trial. Whatever the degree of guilt, those charged with a federal crime are entitled to be tried by the standards of guilt which Congress has prescribed."

Although the law officer did instruct as to the offenses in part, and did not fail completely to do so, as, for example, was the case in United States v. Clay, supra, the omission here was substantial under any approach to the problem, and the charge as given so inadequate and incomplete that it may be said the same result was reached. See authorities cited in the Clay case, supra. Assuming without deciding, however, that the prejudicial character of this error must depend on the state of the record, there are special reasons in the present case for concluding that specific prejudice resulted to the accused from failure to instruct more fully.

It is certainly true that "the specific intent or frame of mind may be established" by "circumstantial evidence, as by inference from the act itself," as well as by "independent evidence, as, for example, words proved to have been used by the offender." See Manual for Courts-Martial, supra, paragraph 140a, page 188. However, here several evidential items appear to point directly away from, rather than toward, an intention to harm Stuart. The Government's evidence itself, for example, suggests the possibility that the petitioner used his pistol only for the purpose of frightening Agent Stuart. The testimony of the latter also reveals that, at the moment the accused directed his weapon at Stuart, he announced his refusal to surrender his pistol, and in some degree, at least, implied that he meant the Agent no harm in the absence of an attempt to disarm him. Here we find no overt physical demonstration of intent to injure, or spoken threat of violence on the part of Cromartie. The latter was required by regulation to carry the weapon, and he was under no restraint, or even suspicion, at the time the incident occurred. Indeed, it is possibly arguable that the demand of Agent Stuart was wholly unjustified under the circumstances. An intent to inflict bodily harm—if it, in fact, existed—might well have manifested itself when the Agent reached for his own pistol. Yet instead of attacking, petitioner promptly turned and fled. Moreover, the very act of Stuart in drawing his own pistol, while that of petitioner was directed toward him, would indicate the likelihood of a conviction on his part that petitioner would not in fact fire. It would require courage possessed by few to reach for one's own weapon under these circumstances, unless it be believed that the assailant had small intention to attack. It is of further significance that at no time during his flight and subsequent apprehension did Cromartie attempt to discharge his weapon. We are certain that, in this state of the evidence, a specific reference to the necessity for a finding of an intent to do bodily harm was of paramount importance.

## VI

We are without hesitation in saying that the evidential posture of the present case was not such as to render essential an instruction on simple assault. Most certainly, failure to have done so does not constitute reversible error. As to assault with a dangerous weapon in violation of Article of War 96, supra, we note that the instructions of the law officer do embody the essential elements of that offense. It follows that the decision of the board of review must be reversed as to the specification of Charge I and the Charge. However, a second offense was alleged —wrongful possession of marihuana

—and of it the accused was found guilty. We have considered the record of trial and find that the conviction of this crime is amply supported by the evidence before the court-martial and without substantial error. The record is returned to The Judge Advocate General, United States Army, for reference to the board of review for consideration of the possibility of guilt of a lesser included offense on the assault charge or for other action not inconsistent with this opinion.

Chief Judge QUINN and Judge LATIMER concur.