UNITED STATES, Appellee

v.

HARVEY T. McELROY, Captain, U. S. Army, Appellant

3 USCMA 606, 14 CMR 24

William E. Leahy, Esq., William J. Hughes, Jr., Esq., and Lt Col Her-- man P. Goebel, Jr., U. S. Army, for Appellant.

Lt Col William R. Ward, U. S. Army, for Appellee.

## Opinion

George W. Latimer, Judge:

In the light of the concepts announced by the Chief Judge and by Judge Brosman in their separate opinions, the principles set out by the author judge do not become the law of the Court. They are, except those which may be expressly concurred with, only the views of the writer of the opinion. Because the majority of the Court conclude an affirmance of the conviction is the proper disposition of this appeal, it is so ordered.

The accused was found guilty of failure to render his accounts as required by Section 643 of Title 18, United States Code. The specification alleged the offense as a violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was sentenced to be dismissed from the service, total forfeitures, confinement for five years, and a fine of $7,000 with an additional confinement of not more than two years if the fine was not paid. Reviewing authorities have upheld the findings and sentence. We granted the accused's petition for review to consider the adequacy of the instruction given by the law officer and the legality of the sentence.

Between October 6, 1951, and July 1, 1952, the accused was ration breakdown officer of Camp Kobe, Kobe, Japan. As such, one of his duties was to receive from unit messes in that area the cash collected for meals served to personnel who were authorized to mess separately. The money was either received by the accused personally or by some authorized person in his office. It was kept in a safe in his office, and was to be turned over to the sales officer in accordance with the provision of TM 10–215, Department of the Army, June, 1948. This Manual provides:

"b. Obtaining Reimbursement. Station commanders are authorized to obtain reimbursement by the following methods:

(1) Collection in cash at the time the meal is served. If this method is used, the unit mess officer will turn in cash collected each day to the unit commander, who will turn it over daily to the officer designated to draw rations in bulk (see chart 17). This officer will turn the cash in to the sales officer as prescribed in paragraph 56a.

• • • • •

"56. Cash Reimbursement

a. Turning in Cash. (1) All cash collected from the sale of meals will be turned in to the sales officer as follows: daily, whenever the cash on hand at the end of the day exceeds $200, but not less frequently than three times a month; and always on the last day of the month, regardless of the amount on hand."

Apparently the accused paid little, if any, attention to those requirements as the sales officer who received the money from him noted three occasions, December 1951, March 1952 and June 1952, on which the accused turned in unusually large sums of money. This was reported to the accused's immediate superior, who mentioned it to the ac-

cused. He excused his conduct by saying that he had so many other duties he had just not been able to get around to it. On the March occasion the sales officer mentioned the irregularities to accused directly but the latter's only comment was substantially the same as the one given to his commanding officer. During that month the accused was in the hospital for a short time, and during his absence the cash was turned in by his superior. On all other occasions it was turned in by the accused. When he returned from the hospital about the middle of March, he was ordered not to retain over $200.00 in his possession.

On July 1, 1952, a board of officers called upon the accused to verify his accounts. At that time he volunteered the following information: that he was about $7500 short, and had been for some time; that he did not report the incident to the Criminal Investigation Division because his dealings with that agency had, in the past, been unsatisfactory; that he did not report the incident to his superior because he thought that he would be able to find out who had taken the money, or that he would somehow learn where it was secreted; that he had spent a few nights sitting in his office hoping that whoever had taken the money would return it; that there was originally over $8000 taken, but he had replaced about $447 with his own money; that his investigation had failed to produce any results; that he was unaware of the money's whereabouts, or who had taken it; and, that he was tired of it all and was quitting.

The shortage in the accused's accounts was duly determined by a qualified accountant who conducted an audit which covered the period from September 1951 to July 1952. The audit revealed the following information:

| Month (1951) | Cash Received in Accused's Office | Cash turned in by Accused to Sales Officer | Cumulative Shortage |
|---|---|---|---|
| September | $805.05 | ........ | $805.05 |
| October | 9,032.80 | $8,881.85 | 956.00 |
| November | 8,991.80 | 8,186.60 | 1,761.20 |
| December | 7,823.00 | 7,627.65 | 1,956.55 |
| (1952) | | | |
| January | 8,251.45 | 7,277.70 | 2,930.30 |
| February | 7,056.55 | ........ | 9,986.85 |
| March | 6,996.55 | 7,663.35 | 9,320.05 |
| April | 6,312.80 | ........ | 15,632.85 |
| May | 5,924.50 | ........ | 21,557.35 |
| June | 4,967.25 | 19,074.60 | 7,450.00 |
| July | 407.55 (1 July only) | ........ | 7,857.55 |
| Total | $66,569.30 | $58,711.75 | |

Cash taken from accused's desk on 1 July 1952 ......... $451.05
Cash taken from accused's safe on 1 July 1952 ......... 28.05
Cash received for accused's account on 1 July 1952 ...... 44.25 523.35

Net Shortage as of 1 July 1952 ..................... $7,334.20

The accused, after being advised of his rights, testified that he took the job as ration breakdown officer under verbal protest because many of the personnel of that office lacked the mentality to perform properly their duties; that several had either been tried by general court-martial or were under investigation; that he had other duties which required his full time and attention; that at the time he took over the job he was given no opportunity to make an audit of the office records to assure that they were in order. He further testified that because he could spend only a limited time on this duty, he authorized a sergeant in his office to accept cash on his behalf; that he was not always able to turn in cash at the times required by regulations because of his other duties; that on several occasions he had attempted to turn the

**609**

money in, but it was not accepted at the time tendered because the sales officer was busy with other matters; that he went to the hospital on March 6, 1952, and the money was discovered missing after his return on March 13; that the dates on certain exhibits were erroneous and the audit inaccurate in that they established money was turned into the sales officer on March 6, 1952, and this was not true; that during his absence the money was in the safe which supposedly was kept locked at all times; that there was no visible evidence that it had been tampered with upon his return; that only he and a locksmith knew the combination; that during the period after the loss was discovered by him the accused had as much as $19,000 in the safe at one time; and that no extraordinary precautions were taken to safeguard it.

Other evidence was produced and it consisted principally of testimony to the effect that during the period involved, the accused did not exhibit large sums of money; that his expenditures were average to those of other officers of his rank and that he did not send large sums of money home.

The specification charged as follows:

"In that Captain Harvey T. McElroy, . . . being at the time an officer duly appointed to draw rations in bulk and having received public monies in the amount of $7,-334.20 which he was not authorized to retain as salary, pay, or emolument, did, at Kobe, Honshu, Japan, on or about 1 July 1952, wrongfully fail to render his accounts for the same as provided by law."

The charge was laid under Article 134 of the Code and it primarily alleged a violation of Section 643 of Title 18, United States Code, which in turn provides:

"Whoever, being an officer, employee or agent of the United States or of any department or agency thereof, having received public money which he is not authorized to retain as salary, pay, or emolument, fails to render his accounts for the same as provided by law is guilty of embezzlement, and shall be fined in a

sum equal to the amount of the money embezzled or imprisoned not more than ten years, or both; but if the amount embezzled does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both."

I undertook to interpret that section in United States v. Doyle, 3 USCMA 585, 14 CMR 3. I there developed the reasons why I concluded Section 643 was intended to create a statutory crime different from embezzlement. The following language was used in that opinion and is applicable to this controversy:

"When Congress enacted Section 643 and provided that any officer or agent who failed to render his account was guilty of embezzlement, it must have had in mind punishing some offense other than one requiring felonious appropriation. That particular offense is proscribed by Section 641 which provides that whoever embezzles money or things of value from the United States or any department thereof shall be fined in a stated amount and imprisoned for a stated period. If I were to interpret Section 643 as merely proscribing embezzlement, I would hold that Congress merely restated Section 641 in different language and thus performed a futile and unnecessary legislative act. There must, therefore, be some difference in the elements required to establish a violation of the two sections."

Developed in a slightly more detailed way, a reference to Section 641, which embodies embezzlement in its usually accepted form, shows it includes records, vouchers, money, or things of value of the United States, or any property made or being made for the Government. In addition, it brings within its coverage anyone who is in possession of the property. Section 643 is limited to the receipt and possession of money and only includes in its coverage officers, employees or agents of the United States. I need not pursue the rules of statutory construction to any great length to establish that Congress

intended to define two separate offenses in those two sections. The first was the crime of embezzlement where conversion of the property is the gravamen of the offense. The second covers accounting for public money, and the material element of that offense is the wrongful failure to account.

I further stated in the *Doyle* case that before one could be found guilty of a violation of Section 643, the court-martial must find a criminal intent. I concluded that when Congress enacted the statute dealing with the handling of public funds by Federal employees it had no intention of eliminating a showing of criminality on the part of the custodian, but it merely intended to place the burden on him to comply with the law or give a satisfactory explanation of his reasons for being unable to do so. I stated the principle in the following language:

". . . For that reason, I believe the element of criminality cannot be entirely excluded. However, because of the clearly expressed Congressional intent to hold officers and employees of the Federal Government who handle Federal funds to a high degree of care, and, because this duty is one which should be imposed upon them, I have concluded that while Congress did not intend to eliminate criminality it did intend to make proof of the statutory elements *prima facie* evidence of the crime denounced by Section 643 and that when those elements had been established it intended to shift the burden to the accused to go forward and explain his inability to account. It would be reasonable for Congress to have so intended."

With the foregoing as a background, I turn to the instruction in the instant case. The law officer informed the court-martial as follows:

"The court is advised that to find the accused guilty of specification 2 of the Charge it must be satisfied by legal and competent evidence beyond a reasonable doubt: first, that at the time and place alleged the accused was an officer, employee or agent of the United States or of a department or agency thereof; second, that as such officer, employee or agent he received certain public monies which he was not authorized to retain as salary, pay or emoluments; third, that he failed to render his accounts for the same as provided by law or applicable regulation; and fourth, that under the circumstances the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces."

The instructions failed to mention the necessity of a finding of wrongful conversion by the accused, and, if that were a necessary ingredient to be included in the instructions, then they would be incomplete. However, I have previously shown why it is not required to establish that element in this offense. With that excluded from consideration, the elements of this offense are that the accused was an officer of the Army; that he received public money he was not authorized to retain as salary, pay or emoluments; and that he failed wrongfully to render his accounts for the same as provided for by regulation. If those are established, the Government has proven a *prima facie* case and the burden shifts to the accused to make a reasonable explanation. If he shows facts from which it could be concluded reasonably that he did not wrongfully fail or that he possessed no general criminal intent, then he should not be found guilty. If, on the other hand the explanation is not reasonable, then the court-martial is at liberty to return a finding of guilty. This does not do away with the necessity of finding a *mens rea* as the facts and circumstances, including any explanation offered, must permit the court-martial to infer beyond a reasonable doubt that the violation was committed with a guilty mind before it can return a finding of guilty.

When we view the posture of the instructions and evidence in this case

we find both sufficient. It is true the instruction does not specifically require a finding that the failure to account must be supported by the general criminal intent but most instructions on crimes dealing with that intent do not specifically mention that mental condition. The instruction given does require a finding that the custodian failed to comply with the law and regulations, and, if the violation is wilful or unless the failure can be explained on some reasonable basis it must be wrongful. There is in the record what amounts to a judicial conclusion of the wilfulness of the violation, so unless accused's explanation is reasonable, a criminal intent is present. While it might have been better for the law officer to have further developed that subject the elements required by the statute were all included and there were no requests made for amplifying or explanatory instructions. In keeping with our previous holdings, accused is in no position to complain, if those given cover the minimal requirements, and, here they do.

When the facts and circumstances, including the explanation offered by the accused, are evaluated, it is an easy test to conclude that the failure to give more complete instructions did not bring about a miscarriage of justice. There was no substantial issue concerning the accused's failure to account as required by regulations. In the first place, when testifying, he admitted his failure to submit the reports and turn in the money. In the second place, he knew the regulations and over a period of eleven months he was guilty of repeated violations. He knew he was required to make daily remittance if the amount collected reached $200.00 and yet he collected $12,000 over a sixty day period without any turn-in. He was warned on at least four occasions that he was not complying with regulations. Had he made any attempt to submit his accounts as required, he would not have been short $7334.20 as he would not have had more on hand than the greater of $200.00 or one day's receipts. A study of the audit shows his cumulative

shortage went from $800.00 the first month to $21,000 the ninth month. His shortage was discovered by him on or about March 13, 1952, and he made no disclosure until almost four months later and only then when a board of officers appeared to check his accounts. After the date he claims to have found out about the shortage he did not consider it necessary to follow the procedure required by regulations. During the next ninety days he made only one deposit and his cumulative shortage continued to increase. He was approximately $3000 short in January 1952, and when he made his next deposit in March 1952, he was approximately $10,000 short. He claims the money was taken while he was in the hospital but on the day he entered he delivered $5405.15 and if his story is to be believed he left some $8000 in the safe. Besides being incredible this still leaves him a substantial amount unaccounted for. A more wilful and deliberate violation of regulations could hardly be pictured.

Accused seeks to explain his delict by saying his other duties prevented him from rendering a proper accounting of the money. That explanation is ridiculous when considered in the light of the time element and the few records necessary to be prepared to account for the cash. He found time on the day he was hospitalized to turn in approximately $5405.15 in cash and there is no apparent reason why he could not have remitted any other amount he had on hand. Up until that time and over the five months' period he had turned in money on only 43 separate vouchers. While shortages were accumulating over that period many working days passed without any remittance. In the first sixty-day period there was a $956.00 discrepancy between the amount he had received and the amount turned in, and the records show only sixteen vouchers accounting for funds. Why he, or his office help, could not find enough time when making out the 43 vouchers over the nine-month period, or at any other time, to account for all the money received is not satisfactorily shown. Certainly, if the accused did not continuously peculate, his

612

wilful disobedience of regulations made it possible for someone else to do so. And if they did, they had a willing accomplice, as even a perfunctory performance of duty by him would, have disclosed the shortage as early as the first month of operation. I have no doubt that reasonable men would discard accused's explanation as unbelievable and that they would find his failure to account wrongful.

It is next asserted that the sentence imposed by the court-martial was illegal, for it contained both ■ total forfeitures and a fine. United States v. DeAngelis, 3 USCMA 298, 12 CMR 54, is dispositive of this contention. We held there that the two could be included in the same sentence, and that to do so did not violate any provisions of the Code or the Manual. While that case was decided under the 1949 Manual, a comparison of its provisions and those of the 1951 Manual show that no material changes have taken place with regard to this problem, and the language of the two is essentially similar.

While it is true the Manual, paragraph 126$h$(3), speaks of fines and forfeitures in the alternative, by no means does that exclude the possibility of them being imposed simultaneously. Undoubtedly, the amount of the fine was determined by the loss occasioned to the Government. This is an acceptable method of determining the amount to be imposed and the sentence is legal.

The decision of the board of review is affirmed.

BROSMAN, Judge (concurring in the result):

In United States v. Doyle, 3 USCMA 585, 14 CMR 3, decided this day, I have detailed my construction of ■ 18 USC § 643 which requires the submission of true and accurate accounts, and concludes that a willful failure to submit such accounts creates criminal liability. By "willful" as I am using it in the instant case, I mean a knowing choice not to submit the accounts required, or a conscious election to render inaccurate accounts.

The record of trial before us reveals that the accused took the witness stand, and specifically admitted ■ that he had chosen not to submit the "turn-in slips" required by military regulations. The explanation presented for his choice not to return such slips would, if believed, constitute neither an excuse nor a justification. Accordingly, I cannot see that prejudice could possibly have resulted to the accused from the law officer's failure to direct the court's attention to the element of willfulness—because the accused's sworn admission of guilt from the witness stand had, for this purpose, the effect of a plea of guilty. See United States v. Lucas, 1 USCMA 19, 1 CMR 19.

In this case, as in Doyle, I had misgivings concerning the specification's sufficiency to allege the required element of willfulness. ■ ness. However, there is here a distinct allegation that the accused *wrongfully* failed to render his accounts. As indicated in the Manual, paragraph 28$a$, the word "wrongfully" is used to "import criminality." In certain of the Manual's form specifications, wrongfully is coupled with willfully. Manual for Courts-Martial, United States, 1951, Appendix 6$c$. See e.g. sample specifications 141 and 147. Arguably, wrongfully is, by implication, distinguished from willfully—at least under certain conditions. But cf. United States v. Ariola, 2 USCMA 637, 10 CMR 135. Elsewhere wrongfully is used in tandem with unlawfully—under circumstances where intentional, as opposed to negligent, conduct is the probable object of proscription. See e.g., Manual, supra, sample specifications 142, 152, 154, 156 and 157. Still elsewhere, wrongfully is used in sample specifications which seem chiefly directed against intentional wrongdoing. See e.g., Manual, supra, sample specifications 118, 119, 136, 137, 149 and 155. In short, the meaning of wrongfully can, Proteus-like, be adapted to varying legal dimensions and meanings.

In construing the instant specification and with a certain amount of special reliance on the statute's omission of an express requirement of willful-

ness, I have concluded that the pleading under scrutiny *does* suffice to inform the accused that he is being charged with an intentional and knowing failure to render his accounts, as provided by law. Of course, words sufficient to allege an offense do not necessarily suffice to instruct a court-martial thereon. Consequently, I would probably feel here that the word "wrongfully" would not satisfy minimum demands in advising the members of the court that willful conduct was an element of the offense charged against the accused. State v. Fordham, 13 ND 494, 101 NW 888. As mentioned earlier, however, instructional inadequacies do not concern me in the present case, since the accused from the stand established his own guilt.

Accordingly I agree with Judge Latimer that the board of review should be affirmed.

QUINN, Chief Judge (dissenting):

In my opinion in United States v. Doyle, 3 USCMA 585, 14 CMR 3, I discussed the meaning and purpose of 18 USC § 643. I there pointed out that said provision was intended to assure the filing of formal reports of account in accordance with the requirements of law as to time, manner, and place; it was neither evolved nor developed as a means of actual accounting by an officer entrusted with public money. Therefore the same situation obtains here as in the *Doyle* case. I would dismiss the charges.

Apart from the construction of the statute, reversal of the conviction is required because of the improper instructions of the law officer. We all agree that criminal intent is a necessary element in the offense defined in Section 643. See also Mackey v. United States, 290 Fed 18 (CA6th Cir) (1923); United States v. Dimmick, 112 Fed 350 (DC Calif), affd 116 Fed 825 (CA 9th Cir), cert den 189 US 509; 28 Op Atty Gen 286. Every essential ingredient of an offense must be defined by the law officer in his instruction to the court. United States v. Rhoden, 1 USCMA 193, 2 CMR 99. As a general rule, the omission of an element cannot be supplied by evidence of guilt, however compelling it may be. The court must be told in the instruction that the act charged constitutes an offense only if it is accompanied by a criminal intent. In any event, therefore, we should reverse the finding of guilty and order a new trial. United States v. Cromartie, 1 USCMA 551, 4 CMR 143; Mackey v. United States, supra. Particularly apposite is what was said by Judge Brosman in United States v. Cromartie, supra, where the law officer, as in this case, failed to instruct the court on the intent element, of the offense charged:

"Although the law officer's neglect is comprehensible, he did in fact omit all reference to what is perhaps the crucial element of the aggravated assault alleged. In several recent instances we have had occasion to consider the effect of failure to instruct concerning the essential elements of an offense. We have held that the provisions of Article 51(c), supra, are mandatory, that they grant to an accused a substantial right, and that failure to follow the Code's mandate in this particular, when a plea of not guilty has been entered, is an error which materially prejudices the substantial rights of the accused and requires reversal."

Judge Brosman avoids the clear necessity of an instruction on intent by finding that the accused judicially confessed his guilt. The evidence shows that the accused failed to submit the required periodic reports in April and May 1952. The accused admits in his own testimony that he deliberately and wrongfully failed to file his report for those months. Had his admission covered the date charged, to wit, July 1, 1952, or one reasonably close to it so as to avoid any possibility of a fatal variance, I would agree with Judge Brosman's conclusion that the accused's judicial admission foreclosed any claim of prejudice. However, the accused's admission did not go that far. Consequently, he was entitled to have the issue of his guilt submitted to the court under proper instructions. United States v. Rhoden, supra.