UNITED STATES, Appellee

v.

JOHN PAUL DOYLE, Lieutenant (junior grade),
U. S. Navy, Appellant

3 USCMA 585, 14 CMR 3

586

587

No. 1804

Decided January 8, 1954

CDR John T. Davies, USN, for Appellant.
CAPT Carl G. Lutz, USMCR, for Appellee.

## Opinion

GEORGE W. LATIMER, Judge:

In the light of the concepts announced by the Chief Judge and by Judge Brosman in their separate opinions, the principles set out by the author judge do not become the law of the Court. They are, except those which may be expressly concurred with, only the views of the writer of the opinion. Because the majority of the Court conclude a dismissal of the charges is the proper disposition of this appeal, it is ordered. However, two judges are of the opinion any dismissal is without prejudice to further proceedings against the accused.

The accused was found guilty of failure to render his accounts as required by Section 643 of Title 18 United States Code. The specification alleged the offense as a violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. The court-martial sentenced him to forfeit $100 a month for twelve months, and to lose one thousand unrestricted line officer running mate points. Reviewing authorities upheld the findings and sentence, and The Judge Advocate General of the Navy thereupon certified for our determination the following questions: (1) Is the evidence sufficient to support the findings? and (2) Were the instructions given by the law officer sufficient?

Because there is no substantial dispute in the facts and further because in its opinion the board of review states succinctly those relevant to the issues certified, I set them out as they are related in that opinion. The accused was, on October 31, 1951, the disbursing officer at the U. S. Fleet Air Defense Training Center, Dam Neck, Virginia Beach, Virginia, and had been since April 1949. LTJG Willard F. Havener, SC, USN, reported for duty at Dam Neck, Virginia, on September 22, 1951, but did not relieve the accused as disbursing officer until October 31, 1951. The accused prepared, at the close of business on October 24, 1951, a daily balance sheet in rough showing at that time there was $10,382.88 in cash in the safe at Dam Neck. At 5:30 on the morning of October 25, 1951, he issued special pay in the amount of $300 to one William R. Hunt, cook first class; and at 5:45 the same morning he departed from the station on leave, returning from leave at 6:20 p.m. on October 30, 1951.

It was customary not to make daily reports or daily balance sheets when the disbursing officer was on leave, and no such sheets were prepared for October 25, 26, 27, 28, 29 and 30, 1951. Normally, the accused had from $8,000 to $10,000 in cash in his safe; and he was permitted a limit of $10,000, except for pay days when with authority this limit was exceeded. The safe was equipped with an outer and inner door. Some of the cash was kept in the sneak-proof box in the bottom and some in the two cash drawers. The drawers were not inside the inner door but above the inner door. The lock on the inner door was inoperative (either because of disrepair or because the combination was not known). The outer door was equipped with a 3-combination lock. The evidence indicates that the office was equipped with two safes, and the inner doors were interchangeable. A safe expert had been called once or twice to the station to put the combinations on the inner door

of the safes in working order. The testimony is vague as to whether this was before or after the loss was discovered. There was testimony by a witness for the defense to the effect that there was no regulation requiring disbursing officers' safes to be equipped with an inner door—all that was required being that the safe be a 3-combination safe. The safes in question met the requirements even though the inner combination or lock was inoperative.

The accused returned from leave at approximately 6:20 p.m. on October 30, 1951, and reported to his office at 7:20 a.m. on October 31. On this date he opened the safe at 10:00 a.m. for the purpose of giving LTJG Havener, his relief, a check for $27,379.65. At that time he did not inspect the cash drawer, the blank checks being kept at the top of the safe in the little box commonly referred to as the sneak-proof box. After the blank check was obtained, the accused closed and locked the safe, and went in company with other officers to inspect a building at the other end of the station. LTJG Havener went to inspect or inventory provisions in another part of the area, and after lunch returned to the supply (disbursing) office about the same time as the accused returned. At about 11:55 a.m. on October 31, 1951, the accused returned to his office; and at about noon, in the presence of his relief, opened the safe to receive payment of mess bills brought in by two enlisted men. When the safe was opened to receive payment of these bills, it was discovered at this time that all the cash was gone, except one single $1.00 bill. There were four or five persons present at this time. The accused immediately asked LTJG Havener to report the loss to the commanding officer, but the commanding officer was not in his office. The accused, being informed of this by LTJG Havener, immediately called the executive officer by telephone at his home, reporting the loss. The O.N.I. and F.B.I. also were notified. On this date the Navy Regional Accounting Office was notified, and that office sent an officer and two civilian employees to Dam Neck to prepare the monthly financial return as of October 31, 1951, which was duly signed by the accused as being correct. These returns and balance sheets, signed by the accused, disclosed a cash shortage of $8,921.00.

The testimony discloses that on September 1 or 2, 1951, the accused drew $8,000 in cash from the Virginia Beach branch of the National Bank of Commerce of Norfolk, Virginia. This check, and two others that were spoiled in typing, were voided after the money was returned to the bank. No entry reflecting this transaction was made in the books or exhibits adduced at this trial. The accused explains this by stating that he expected a group of trainees would be paid on that date, but they did not show up and he simply returned the cash to the bank and received back the check for $8,000 after talking with the bank official.

At all accounting periods prior to October 31, 1951, the cash on hand was counted and verified by a cash auditing board consisting of two officers, the last verification being under date of September 30, 1951. The accused testified that he did not take the money, and that he had no idea what had become of the money. He also placed in evidence exhibits showing excellent fitness reports and commendations received during his naval career of about nineteen years and six months.

At the close of the testimony, counsel for the accused requested that the law officer instruct the court that the absence of funds is not conclusive of the violation in the absence of other evidence to show the loss of funds was due to the fault of accused. I assume from the nature of and the manner in which he made the request that defense counsel was seeking an instruction on criminality. The law officer refused the request as he concluded to submit the issues in a different manner.

Section 643 of Title 18, United States Code, which was the basis for the charge against the accused provides:

"Whoever, being an officer, employee or agent of the United States or of any department or agency thereof, having received public money which he is not authorized to retain

as salary, pay, or emolument, fails to render his accounts for the same as provided by law is guilty of embezzlement, and shall be fined in a sum equal to the amount of the money embezzled or imprisoned not more than ten years, or both; but if the amount embezzled does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both."

In charging the members of the court, the law officer stated that the charge against the accused alleged a violation of the section referred to above. He then continued:

"Now, the words in that specification, 'render his accounts for,' as used in this section, that is, section 643, Title 18, U. S. Code, and in the specification under Charge I should be interpreted to mean, 'To require or cause a person to account for or to turn over to or to deliver to the proper officer, agent, or office, an account for such money or property when required to do so by law or regulation.' Now, under this statute an unexplained shortage, and by unexplained is meant that no satisfactory explanation has been made of any shortage. Under this statute an unexplained shortage of any person connected with disbursing duties is prima facie evidence of embezzlement. If the statute meant anything else the statute would be rendered absolutely meaningless.

"In the case at bar the essential elements of proof are actually the essential facts to be proven from the specification itself.

"The court is further advised that if you find from the evidence, first, that the accused was an officer of the United States; two, that as such he received public money, which he was not authorized to retain as salary, pay or emolument; three, that he failed to render his accounts for the same as provided by law; fourth, that under the circumstances such action was a violation of Title 18, section 643 of the U. S. Code, then you may find the accused guilty of the offense as charged."

In approaching a solution of the difficult problem presented in this case, we must first consider the Congressional intent as expressed in the phrase "failed to render his account for the same [funds] as provided by law." Counsel for accused press on us the argument that this phrase in substance means no more than that the custodian shall submit the necessary forms and if they report the actual events, then there has been a compliance with the statute. Stated somewhat differently and specifically applied to this case, he would have us hold that when the accused signed the report in which he stated that some $8,900.00 had mysteriously disappeared, he had met the demands of the section. For obvious reasons I do not adopt that construction. I believe that Congress, when it used that phrase, intended that the custodian of the funds must have in his possession for delivery to the Government or to his successor the money he is charged with less that paid out for authorized purposes. So long as he is unable to deliver the cash he has not paid out for Governmental purposes, or satisfactorily explain the reasons why he cannot, he has not rendered an account of his stewardship within the meaning of the statute. The reason assigned in this case, that he cannot account for the loss of the money, leaves the accused far short of having rendered an account of the funds in his possession. To hold otherwise would permit an accused to comply with the statute by merely making an entry on a daily balance sheet that the cash could not be located. I believe that by interpreting the statute to that effect we would not effectuate the intent of Congress.

This brings me to the first of the real problems. There are two branches to this issue. First, must the Government show a criminal intent on the part of the accused? Second, if so, is the evidence in this case sufficient to permit the members of the court to conclude the accused had that intent? In developing the first branch, I shall mention the general principles and then determine whether this particular type of offense should be governed by those

principles or whether it is governed by a different rule. Generally speaking, it can be said that if ▮ crimes do not involve some question of public welfare or carry petty penalties, they require a general or specific criminal intent. On the other hand, those which can be placed in either or both of those classes need not.

The latest United States Supreme Court case speaking of criminal intent as being the essence of an offense, under what is a slightly different setting, is Morissette v. United States, 342 US 246, 96 L ed 288, 72 S Ct 240. I shall quote rather extensively from that opinion as it discusses thoroughly the general rule outlined above. The facts of that case were these: Morissette was indicted on a charge that he unlawfully, wilfully, and knowingly stole and converted property of the United States of the value of $84.00, in violation of 18 USC, section 641. He was on a Government reservation and loaded three tons of spent bomb casings on his truck. He took them to a nearby farm where they were flattened by driving a tractor over them. He subsequently sold them for $84.00. His defense was that he thought the property had been abandoned by the Government; that he did not intend to steal the property; and, that he took it with no wrongful or criminal intent. The trial judge refused to submit or to allow counsel to argue to the jury whether Morissette acted with innocent intentions for the reason that he concluded guilty knowledge was not an element of the crime charged. The Supreme Court held this reversible error saying that the absence of words denoting criminal intent from the body of the statute does not eliminate criminality as a necessary ingredient of that offense for Congress had merely adopted into Federal statutory law a well-known crime. At pages 261 and 262, the Court makes the following statement:

"Congress, therefore, omitted any express prescription of criminal intent from the enactment before us in the light of an unbroken course of judicial decision in all constituent states of the Union holding intent inherent in this class of offense, even when not expressed in a statute. Congressional silence as to mental elements in an Act merely adopting into federal statutory law a concept of crime already so well defined in common law and statutory interpretation by the states may warrant quite contrary inferences than the same silence in creating an offense new to general law, for whose definition the courts have no guidance except the Act."

While it is true that there was no crime identified as embezzlement in early common law, many crimes which are now characterized by that name were then offenses under a different label. If we were considering embezzlement as it was considered in its infancy, the rule quoted from Morissette might be dispositive of this issue. For the crime of embezzlement has long been regarded as one which involves criminal knowledge or intent. To buttress this statement, I quote from a Federal jurisdiction. In Hancey v. United States, 108 F2d 835, the Circuit Court of Appeals for the Tenth Circuit stated:

". . . The crime of embezzlement is committed when property belonging to another, rightfully in possession of accused, is feloniously appropriated. Subsequent repayment does not vitiate the crime. *The gravamen of the offense is the intent coupled with its execution.*"

The rule announced in that case merely reaffirms the old common law concept that there could be no crime if there was no evil intent. 1 Bishop, Criminal Law, 9th ed, § 287, page 192, states the early rule in the following language:

"There can be no crime, large or small, without an evil mind. In other words, punishment is the sequence of wickedness. Neither in philosophical speculation, nor in religious or moral sentiment, would any people in any age allow that a man should be deemed guilty unless his mind was so. It is therefore a principle of our legal system, as probably it is of every other, that the

essence of an offense is the wrongful intent, without which it cannot exist."

In modern times a formidable body of law has grown up which appears to be drifting away from the rule quoted in Bishop. Presently there are certain offenses which do not require evil intent as a necessary ingredient of the offense. Referring again to the Morissette case, the Supreme Court has this to say about that class of cases (page 252):

"However, the Balint and Behrman offenses belong to a category of another character, with very different antecedents and origins. The crimes there involved depend on no mental element but consist only of forbidden acts or omissions. This, while not expressed by the Court, is made clear from examination of a century-old but accelerating tendency, discernible both here and in England, to call into existence new duties and crimes which disregard any ingredient of intent. The industrial revolution multiplied the number of workmen exposed to injury from increasingly powerful and complex mechanisms, driven by freshly discovered sources of energy, requiring higher precautions by employers. Traffic of velocities, volumes and varieties unheard of came to subject the wayfarer to intolerable casualty risks if owners and drivers were not to observe new cares and uniformities of conduct. Congestion of cities and crowding of quarters called for health and welfare regulations undreamed of in simpler times. Wide distribution of goods became an instrument of wide distribution of harm when those who dispersed food, drink, drugs, and even securities, did not comply with reasonable standards of quality, integrity, disclosure and care. Such dangers have engendered increasingly numerous and detailed regulations which heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare.

"While many of these duties are sanctioned by a more strict civil liability, lawmakers, whether wisely or not, have sought to make such regulations more effective by invoking criminal sanctions to be applied by the familiar technique of criminal prosecutions and convictions. This has confronted the courts with a multitude of prosecutions, based on statutes or administrative regulations, for what have been aptly called 'public welfare offenses.' These cases do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty."

Professor Sayre in an article on Public Welfare offenses, 33 Col. Law Rev. 55, notes that those offenses which do not involve criminal intent fall roughly into the following categories:

"1. Illegal sales of intoxicating liquor:

. . . . .

2. Sales of impure or adulterated food or drugs:

. . . . .

3. Sales of misbranded articles;

4. Violations of anti-narcotic acts;

5. Criminal nuisances:

. . . . .

6. Violations of traffic regulations;

7. Violations of motor-vehicle laws;

8. Violations of general police regulations, passed for the safety, health or well-being of the community."

It is certain that the crime of embezzlement as originally known would be a miscast if included with those offenses. However, it does not follow that that group of Federal offenses which seeks to protect public monies and which has been labelled "embezzlement and theft" does not fall in an allied class. It might not be unjustifiable for Congress to impose sanctions on Federal officers for neglect of duty

in handling and protecting Government funds even though criminal intent was not present, and certain statutes seem to proclaim that Congress has done just that. The particular group of enactments of which I speak is found in 18 USC §§ 641–663 and covers crimes such as carrying away tools and implements which could be used in printing money, bills, or bonds; bankers receiving and agents making unauthorized deposits; court officers retaining funds after demand; officers or agents failing to deposit money belonging to the United States; use of public funds by custodians; depositors failing to safeguard deposits; payments by a finance officer of lesser sums in satisfaction of a greater amount; conversion of property belonging to another by one who obtains it by virtue of his employment by the United States; and misapplication of funds by bank examiners and bank officers. Assuming, without deciding, that it is legal for Congress to make those specified acts criminal, without regard to the intent with which committed, there nevertheless remains the question as to whether Congress intended to do so.

There has been and must be a distinction between a violation of law with a wicked mind and an inadvertent violation. Justice Holmes in his book "The Common Law" in considering criminal intent made the observation "Even a dog distinguishes between being stumbled over and being kicked." While we observe distinguishing features between the violations there are instances when the differences are obscure and indistinct and this one is in the shaded area. In most offenses where the legislature has seen fit to eliminate the element of criminal intent, the sanction is imposed because of the nature of the act itself and not necessarily because of the intent with which it is performed. In the class of crimes identified as "public welfare offenses," the harm to the public is complete with the doing of the act and the intent with which it is done does not change the character of the crime nor the potentialities of harm to the public. While the proscribed act may be only a neglect, the damage to the public from repeated violations is great and the criminal penalty is imposed to discourage violations. Usually, the legislatures in imposing penalties for offenses included in that class have limited punishments to those of a petty nature because to punish severely one who causes loss or injury through mistake or accident is hostile to the ordinary concepts of justice. Because of the foregoing, to test whether criminal intent is a necessary criteria in an offense, it is well to measure the statute by: (1) the character of the offense, and (2) severity of the punishment.

The difficulty encountered is that when the measurements are applied to this particular statute, the statute only roughly fits them. As to the character of the crime, it is not what in the ordinary sense is considered a public welfare offense, but clearly the public good is affected indirectly by the loss or misapplication of public funds. The primary intent of the enactment is to punish the trustee who does not honor his trust. A fiduciary who places his funds in a depository that has not been designated as accredited, violates a public trust, regardless of his intent; a banker who accepts deposits knowing they are not authorized, may be guilty of an offense even though he did not accept them with a wicked mind; a custodian who fails to deposit Federal funds as required by statute has committed a breach of good faith irrespective of his mental condition. While at first blush these offenses seem to be civil in character, in view of the fact that by committing them the violators undermine the faith of the public in its system of Government and gamble with money belonging to the people, they take on the color of serious offenses regardless of the motive of the perpetrator.

Because of the severity of sentence, the statute suggests a possibility that Congress intended to limit violations to those with wicked intentions. It is conceded that the maximum confinement is ten years and the maximum fine is $10,000. Even though the amount involved is less than $100 and the punishment is light, the offense cannot be

considered as minor. The present act equates the punishment to that which existed when the crime of larceny was divided between two degrees, petty and grand. If the amount misappropriated was in the lower brackets, it was a misdemeanor; if in the higher, a felony. When the stigma of, and sentence for, a felony follows conviction, the offense must be considered serious.

If the statute does not define an offense which can be governed by public welfare principles, must it be said that Congress intended that the Government must prove criminal intent? When Congress enacted Section 643 and provided that any officer or agent who failed to render his account was guilty of embezzlement, it must have had in mind punishing some offense other than one requiring felonious appropriation. That particular offense is proscribed by Section 641 which provides that whoever embezzles money or things of value from the United States or any department thereof shall be fined in a stated amount and imprisoned for a stated period. If I were to interpret Section 643 as merely proscribing embezzlement, I would hold that Congress merely restated Section 641 in different language and thus performed a futile and unnecessary legislative act. There must, therefore, be some difference in the elements required to establish a violation of the two sections.

As was stated by the Supreme Court, neither that court nor any other has undertaken to delineate a precise line or set forth criteria for distinguishing between crimes that require criminal intent and crimes that do not. Generalization may lead me to folly, but it should be noted that, in criminal statutes generally, the offenses which are proscribed can be committed by more than a small segment of the public. Morissette was charged with larceny and anyone with an evil intent can steal from the Government. Also anyone who can obtain possession of property rightly can commit the crime of embezzlement. Everyone can violate traffic and other public welfare measures. However, the particular offense with which we are now concerned is limited to a class, i.e., officers, employees and agents of the Government. It applies to those who are trustees of Federal funds and upon whom a high degree of care can and must be imposed. Large amounts of cash are in possession of officers and agents of the Federal Government and this requires that the highest degree of care be exercised by them. If we literally interpret the section, the command of Congress seems to say that if there is a failure to account, with or without criminal intent, an offense has been committed but interpretations should bring about common sense results and this one would not.

In this case I make no attempt to delineate a precise line of demarcation for offenses which do or do not require intent. I only go so far as to state that in this instance I believe the offense does. I conclude this because I am not convinced that Congress intended to make an offense out of an act which could be innocent, and without a clear expression to that effect I am free to assume otherwise. It would be shocking to hold that, if the accused in this case had deposited the money in the safe, and during the night an admitted burglary had occurred and the money was stolen, he would be guilty of an offense because he was unable to produce the cash. For that reason, I believe the element of criminality cannot be entirely excluded. However, because of the clearly expressed Congressional intent to hold officers and employees of the Federal Government who handle federal funds to a high degree of care, and, because this duty is one which should be imposed upon them, I have concluded that, while Congress did not intend to eliminate criminality, it did intend to make proof of the statutory elements *prima facie* evidence of the crime denounced by Section 643 and that when those elements had been established it intended to shift the burden to the accused to go forward and explain his inability to account. It would be reasonable for Congress to have so intended. It has so prescribed in instances of other offenses which have a great deal of similarity to the one here

in issue and the rule is founded in reason. The possessor of funds is the only one who can know with certainty whether they are expended properly or misappropriated. Once cash is passed to his possession its disposition, except in unusual circumstances, is solely and exclusively under his control. If the funds are dissipated, he alone can explain. Once receipt of funds is admitted, the burden should be upon the custodian to come forward and render an account of his trusteeship showing appropriate expenditures. Cash is too easy to lose. If there are any shortages, the burden must be cast upon him to make a reasonable explanation for their presence. If he fails, then the court-martial may find all elements, including criminality, present, otherwise not. Stated somewhat more concretely, I believe that in this type of offense if the Government at the trial establishes that one of its officers, employees, or agents has received public money which he is not authorized to retain as salary, payment, or emoluments, and he fails to render his account for it by having the cash or its equivalent on hand, or accounting legally and properly for its expenditure, a *prima facie* case of the statutory type of embezzlement proscribed by Section 643 has been established. The accused can then either rely on the weakness of the Government's case or he can assume the burden of going forward and explaining the reasons for his apparent delict. If he comes forward with an explanation, the court-martial must consider the testimony favorable to him together with all other evidence in the case, and if it is not satisfied, beyond a reasonable doubt that the offense has been committed, it will acquit. However, if the explanation offered by the accused is not considered reasonable, and the court-martial finds the Government has otherwise proven the offense beyond a reasonable doubt, then a finding of guilty may be returned.

This brings me to the instructions given by the law officer. He advised members of the court-martial that the charge was laid under Article 134, Uniform Code of Military Justice, 50 USC § 728, the specification being authorized by the third clause of that Article which provides for punishing crimes and offenses not capital. He further advised the members that Title 18, United States Code, Section 643, defines an offense which falls in that category, and, that they should consider the charge was preferred as a violation of that section. The instructions on the elements of the offense as defined in that section, and in amplifying the one element, are set out early in this opinion. When the one defining the offense is considered, it appears that the third element, that accused failed to render his accounts as provided by law, was the only one requiring any amplification or explanation. The law officer explained that element by going rather thoroughly into the meaning of "renders his accounts for." I believe his explanation was sufficient in the absence of a request for further clarification.

The accused does not attack the instructions which were given, he contends that prejudicial error flows from the refusal of the law officer to give his request. It was framed in the following language: "that the absence of funds is not conclusive of the violation in the absence of other evidence to show the loss of funds was due to the fault or caused by the accused." I find no error in the law officer's refusing to give the request. If we read the language of the instruction literally, it is erroneous, as a matter of law, as the absence of funds is not conclusive of a violation of the section, with or without evidence that the loss of funds was caused by the accused. If we read it to mean the Government must produce additional evidence that the loss of funds was caused by criminal acts on the part of accused, then it is contrary to the ruling which I believe is applicable.

I am satisfied from the instructions given that the court-martial was required to find, in order to convict the accused, that he was an officer of the United States; that he received money which he was not authorized to retain as salary, pay, or emolu-

ment; that he was required to turn over to his successor officer the $8,921.00 unless he satisfactorily explained the reason for the shortage; that if the court-martial found the explanation satisfactory, the accused had rendered his account; that if it found the explanation unsatisfactory, then the accused had not accounted and had violated Title 18, Section 643 of the United States Code; and that the court could return a finding of guilt if, from the entire record, it was convinced beyond a reasonable doubt, that the accused was guilty of the crime alleged. I am of the opinion that the instruction as given covers all necessary issues involved in the case and that implicit in the finding of guilt is a finding that criminality was present.

Having concluded the burden to explain was on the accused, the question of the sufficiency of the evidence to sustain the finding raises no serious problem. The statute, in substance, provides that when the Government has proven certain facts, the court-martial may regard them, if believed, as sufficient to convict in the absence of an explanation which is reasonable. Here all elements of the offense were established beyond a reasonable doubt with the exception of criminal intent and if the court-martial disbelieved the explanation made by the accused, then it, of necessity, found that he mishandled or misappropriated the money. Implicit in that finding is criminality. The rule is that a court-martial need not accept the uncorroborated testimony of an accused, particularly if it is doubtful, unconvincing, or improbable and in this type of case, the rule is that it must be satisfactory. In this instance, the accused really makes no explanation, he merely states that he does not know what happened to the money. The explanation may be true but it is far from convincing. He and one other man, a locksmith, are the only two who knew the combination to the safe. There is no evidence that the latter opened the safe or that he was near it during the period the money is claimed to have disappeared. The safe was not battered nor broken and it was

not left open. If the money was surreptitiously taken, the culprit had to know the combination and the taking had to be at a time when he would not be observed. It is possible that strangers obtained the money but presence of unauthorized persons in and around the area was not reported. As so often happens in this type of crime, the loss was not discovered until the time the custodian was required to turn the funds over to his successor in office. That time was the end of the period when the loss might have escaped detection. While the cash account was verified each month, it is singular to note that accused admitted what happens to be a rather unusual method of dealing with cash. On the 1st of September 1951, he personally typed three checks for $8,000. He cancelled two because of errors but the third was taken to the bank; cash was obtained; it was in possession of the accused for a period of time; and then on the same day he returned it to the bank. He requested the return of the check and his request was honored; he thereupon tore off and disposed of his signature and indorsement; he made no entry of the transaction in his accounts; and while he fixes the date as September 1, 1951, the checks were made out on August 31, 1951. This unusual event happened either on or the day after the cash was verified in August and there is similarity in the amount of the check and the shortage.

I do not mention these respective vagaries to indicate a belief as to the guilt of the accused. We cannot make that determination as that is a prerogative which belongs to triers of fact. But in addition, when a statute requires that a satisfactory explanation must be given by an accused, credibility is of prime importance. That, too, is resolved by the court-martial and many factors which are not discernible by us aid the court in its determination. The appearance of an accused while on the stand, his candor or lack of candor in testifying, his demeanor and other characteristics which can be observed, are matters which influence those who hear and see the accused. In this instance, after weighing the evi-

dence and after seeing and hearing the accused, they concluded the explanation offered by him was not satisfactory, and thereupon returned the finding of guilty. I believe their conclusion can be supported by the record.

QUINN, Chief Judge:

In my opinion the statute in issue, 18 USC § 643, was not intended to accomplish the purpose attributed to it by my brothers, and the instructions of the law officer were prejudicially erroneous.

As construed by my brethren, the phrase "render his accounts . . . as provided by law," appearing in section 643, means that the officer receiving public money must have in his possession ready for delivery to the Government or his successor the "money that he is charged with less that paid out for authorized purposes." In other words, they hold that the statute makes it an embezzlement if the officer is unable to deliver the cash, or account for any loss; the emphasis is on the accounting for the money itself, rather than on the submission of a formal report giving information to the proper agency in accordance with the requirements for the filing of such report. See 31 USC § 496. This construction goes beyond the language of the statute, but is justified on the ground that Congress "must have had in mind punishing some offense other than one requiring felonious appropriation. . . . If I were to interpret Section 643 as merely proscribing embezzlement, I would hold that Congress merely restated Section 641 in different language and thus performed a futile and unnecessary legislative act. There must, therefore, be some difference in the elements required to establish a violation of the two sections." Accepting that difference as a basis of approach to the meaning of the statute, the conclusion reached by my brothers results in the very thing it seeks to avoid, namely, that there are two sections on embezzlement.

Mere failure of a fiduciary to account will not constitute embezzlement; but a refusal to account when ▮▮▮▮▮▮ demand is made or when the account is due will permit an inference of unlawful conversion to the fiduciary's own use. United States v. Valencia, 1 USCMA 415, 4 CMR 7; Territory v. Hale, 13 NM 181, 81 Pac 583, 585 (1905). In Territory v. Hale, supra, the rule was stated as follows:

"Much confusion arises from a failure to distinguish between the conversion and the evidence of it. The possession being lawful, the conversion may consist in a mere act of the mind whereby the character of the possession is changed and the holding becomes adverse. If this holding is with the intent to deprive the owner permanently of his property, the offense is complete. This intent may be manifested by various acts; such as making false entries, denial of receipts of money, *not accounting when it should be done,* rendering false accounts, or . . . actually expending the money for defendant's own uses contrary to his directions, or otherwise diverting the course of the money to make it his own." [Emphasis supplied.]

In the case of a public officer entrusted with the public money, the inference of an embezzlement from a failure to account has perhaps even greater force. 1 Bishop, Criminal Law, 9th ed, § 373, cited with approval in Fullerton v. Government of The Canal Zone, 8 F2d 968 (CA 5th Cir) (1925). See also Koppe v. State, 211 Ohio App 33, 153 NE 109 (1906).

It follows from the above authorities that the construction given to Section 643 by my brethren produces not a different but exactly the same result as that under the regular embezzlement statute, 18 USC § 641, or the public officer statute, 18 USC § 654. On that basis, Section 643 is a superfluous addition to the criminal law. However, the history of the statute shows that it has a definite purpose in assuring the performance of a necessary duty imposed upon public officers; and a different construction from that given to it by the majority would give effect to that purpose, without duplicating other statutes.

Early in our history, the Government had no protection against embezzlement; it relied wholly upon the good faith and honesty of its officers. United

**597**

States v. Hutchison, Fed Cas 15432 (E.D. Pa) (1848). In that period, accounting for public money involved two stages. The first step of the procedure required the officer to submit a report, with his vouchers, to the proper agencies; the second provided for a settlement of the account by the proper authority and the fixing of a balance for which the officer was accountable. 1 Stat 512, 2 Stat 536, 3 Stat 366. The separate character of the two steps is emphasized by an 1818 report of the Secretary of the Treasury to the Senate. Referring to the gross deficiencies in the submission of reports relating to their accounts by public officers and the pressing need for more effective measures to compel the rendering of these accounts so that they might later be adjusted by the Treasury, the report said:

"In the office of the third auditor of the Treasury, where all the old accounts of the War Department are to be examined, a great mass of accounts remain unsettled. It is in that office where the greatest difficulties are to be surmounted; where remedies of the most energetic character are required. By referring to the reports of that officer, it will be found that the most serious obstacle to the prompt settlement of the public accounts, is the want of power to compel delinquent officers to render their accounts and vouchers. In the Pay Department it is extremely unsafe to settle the accounts of any paymaster, until the accounts and vouchers of every paymaster employed in the same part of the country are rendered.

"The same observation applies with nearly the same force to the quarter master's department. The great mass of officers employed in both of these departments during the late war, and whose accounts are still unsettled, are now out of office. Should a small number of those officers obstinately withhold their accounts and vouchers, the settlement of the accounts of the others as well as their own, will be indefinitely protracted, unless the power of coercing settlements shall be greatly extended. At present the

means of compelling delinquent officers to render their accounts and vouchers for settlement, consists, 1st. In ordering an action to be brought against the delinquent, upon the trial of which no voucher is admissible which has not previously been presented to the accounting officers of the Treasury. 2d. The forfeiture of commissions and the payment of interest at the rate of six per cent. from the time the money was received until it is repaid into the Treasury, if the final judgment should be in favor of the United States; and 3d. The payment of costs, whether the judgment is for or against the defendant.

• • • • •

"The opinions and views presented in those papers, not only remain unchanged, but have required additional force from the experience of the past year. The money remaining in the hands of the officers employed, during the late war, whose accounts remain unsettled must be very considerable. In several cases where they have rendered their accounts and admit considerable balances to be in their hands, they have refused to pay over the balance until their accounts are finally settled; which from the explanations already given, may be protracted to a period so remote, as to subject the government to the eventual loss of the whole, from the death, insolvency, or emigration of the principal and sureties." [Sen Doc No. 74, pp. 6–7, January 22, 1818, 15th Cong., 1st Sess.]

In subsequent legislation, Congress maintained the distinction between rendering the report of the account and the settlement or payment of the balance shown to be held by the officer. See Act of May 15, 1820, Chap. 107, 3 Stat 592.

An Act approved on January 21, 1823, provided for the rendering of accounts in virtually identical language as that contained in the present statute, 18 USC § 643. That Act clearly showed that its purpose was only to provide for the submission of a formal report at stated intervals of time.

"Sec. 2. *And be it further enacted,* That every officer or agent of the United States, who shall receive public money which he is not authorized to retain as salary, pay, or emolument, shall render his accounts quarter yearly, to the proper accounting officers of the Treasury, with the vouchers necessary to correct and prompt settlement thereof, within three months, at least, after the expiration of each successive quarter, if resident within the United States, and within six months if resident in a foreign country: *Provided,* That nothing herein contained shall be construed to restrain the secretaries of any of the departments from requiring such returns from any officer or agent, subject to the control of such secretaries, as the public interest may require." [Act approved January 31, 1823, Chap 9, 3 Stat 723.]

In 1840 Congress finally created the crime of embezzlement. Act of July 4, 1840, 5 Stat 385. It applied only to a limited group but there was no corresponding change in the provision for the rendering of an account by all public officers. Six years later the embezzlement provision was extended to all persons entrusted with public money who failed to produce the balance declared to be due, United States v. Hutchinson, supra; Act of August 6, 1846, Chap 90, 9 Stat 63; but still there was no change regarding the rendering of accounts as such. The only penalty for failing to file the required report was a civil suit for a balance determined to be due by the Treasurer. 3 Stat 592. But, in 1862, apparently finding the civil penalties too light to secure compliance with the duty to submit the required accounts, Congress provided that a failure to render the account itself would be prima facie evidence of embezzlement.

"Sec. 1. *Be it enacted, &c.,* That from and after the passage of this act any officer or agent of the United States who shall receive public money which he is not authorized to retain as salary, pay, or emolument, shall render his accounts monthly instead of quarterly, as heretofore; and such accounts, with the vouchers necessary to the correct and prompt settlement thereof, shall be rendered direct to the proper accounting officer of the Treasury, and be mailed or otherwise forwarded to its proper address within ten days after the expiration of each successive month. And in the case of the nonreceipt at the Treasury of any accounts within a reasonable and proper time thereafter, the officer whose accounts are in default shall be required to furnish satisfactory evidence of having complied with the provisions of this act; and for any default on his part the delinquent officer shall be deemed a defaulter and be subject to all the penalties prescribed by the sixteenth section of the act of August sixth, eighteen hundred and forty-six, 'to provide for the better organization of the Treasury, and for the collection, safekeeping, transfer, and disbursement of the public revenue': *Provided,* That the Secretary of the Treasury may, if in his opinion the circumstances of the case justify and require it, extend the time hereinbefore prescribed for the rendition of accounts: *And provided further,* That nothing herein contained shall be construed to restrain the heads of any of the departments from requiring such other returns or reports from the officer or agent, subject to the control of such heads of departments, as the public interests may require." [Act approved July 17, 1862, Chap 199, 12 Stat 593.]

This statute was amended and elaborated upon by a resolution of Congress which reads as follows:

"*Resolved by &c.,* That so much of the act entitled 'An act to provide for the more prompt settlement of the accounts of disbursing officers,' approved July seventeen, eighteen hundred and sixty-two, as provides that 'such accounts with the vouchers necessary to the correct and prompt settlement thereof, shall be rendered direct to the proper accounting officers of the Treasury,' be, and the same is hereby, repealed; and all such accounts and vouchers shall hereafter be sent to the bureau to which they pertain, and, after the

examination there, shall be passed to the proper accounting officer of the Treasury for settlement." [Resolution No. 48, approved March 2, 1867, 14 Stat 571.]

The Act of July 17, 1862, and Resolution No. 48 of 1867, provided a needed supplement to the regular embezzlement statutes. Prior to the change, a periodic report of the stewardship of public money was required, but each report was not accompanied by an obligation to turn over whatever balance remained in the hands of the officer. On the contrary, it was undoubtedly expected that he was to retain such balance for use in the continued performance of his duties. A delay or default in filing the report at the time fixed by law, without in any way mishandling the funds entrusted to him, subjected the officer to no real penalty, but it seriously complicated the later settlement of his individual account and materially impaired the adjustment of other accounts dependent upon his. See Sen. Doc. 74, supra. Making a default in the submission of the account *prima facie* evidence of embezzlement provided a much more effective method for the timely and complete settlement of all accounts.

Clear recognition that the duty of a public officer to render his account of public money is separate and distinct from his duty to deliver any balance remaining in his hands is also found in the Revised Statutes of 1878. Section 5491 is identical to the present Section 643 of Title 18. In the margin of the former section specific cross-reference was made to Section 3622 of the Revised Statutes. The latter relates to the time when, the manner in which, and the place where, accounts are to be rendered. The two provisions read together point unmistakably to the conclusion that the rendering of an account as provided by law relates only to the filing of the formal account. Moreover, Section 5491 came under the heading of official misconduct. Taken with other embezzlement sections under that heading, it appears clearly that each statute was intended to reach a separate duty of a public officer entrusted with public funds. The mar-

**600**

ginal cross-reference and the heading contained in the Revised Statutes were omitted from the present codification of the penal law, but the language of the statutes remains the same; and certainly the purpose remains the same. Cf. 18 USC § 176 (1940 ed); 18 USC § 643 (1948 ed); and 31 USC § 496.

To complete the statutory pattern which fixes the purpose of Section 643 as requiring only the filing of the formal account, mention of 18 USC, Section 2075, is required. Section 2075 reads as follows:

"Section 2075. Officer failing to make returns or reports. Every officer who neglects or refuses to make any return or report which he is required to make at stated times by any Act of Congress or regulation of the Department of the Treasury, other than his accounts, within the time prescribed by such Act or regulation, shall be fined not more than $1,000. June 25, 1948, c. 645, 62 Stat. 796."

Although Section 2075 specifically excludes accounts, the very fact that it mentions them spells out a clear intent to consider the rendering of an account as a report and not as a formal accounting. When read with Section 643 the Congressional purpose sought to be achieved by the two provisions is clear. That purpose is to make a default in the filing of every report required by law or appropriate regulation a punishable offense.

Since a failure to report on the stewardship of public money may reasonably be considered as a prelude to an actual embezzlement, the default in submission of the report is itself regarded as prima facie evidence of embezzlement. But if there is a filing or rendering of the account according to the requirements of law as to time, manner, and place, the statute is satisfied. Thereafter, if the account discloses a shortage, a false entry, or any other illegal handling of the public monies, a prosecution for a violation thereof must be under a different section of the law. And there is a section which covers each situation. See 18 USC §§ 641, 648–654. Since the uncontradicted

evidence here shows that the accused did in fact render an account in which he disclosed a shortage, he cannot be prosecuted under Section 643. If it is charged that he did not keep the money safely, see 28 Op Atty Gen 286, or that he actually stole it himself, such charge must be under a different section of the law.

Apart from the issue of construction of Section 643, I would reverse the findings of guilty on the ground that the law officer's instructions were prejudicial to the accused.

A failure to render an account must be accompanied by a criminal intent and not merely be the product of accident, illness, or some other innocent act. See Mackey v. United States, 290 Fed 18 (CA6th Cir) (1923); United States v. Dimmick, 112 Fed 350, aff'd 116 Fed 825, cert den 189 US 509, 47 L ed 923, 23 S Ct 850; 28 Op Atty Gen 286. However, the law officer made no reference whatever to criminal intent in his instructions to the court on the elements of the offense. Whether the omission itself would be sufficient to require reversal is a problem which we need not decide, since the law officer's instruction on the meaning of the statute was patently prejudicial.

After stating the charge, the law officer instructed the court as follows:

"Now, the words in that specification, 'render his accounts for,' as used in this section, that is, section 643, Title 18, U. S. Code, and in the specification under Charge I should be interpreted to mean, 'To require or cause a person to account for or to turn over to or to deliver to the proper officer, agent, or office, an account for such money or property when required to do so by law or regulation.' *Now, under this statute an unexplained shortage, and by unexplained is meant that no satisfactory explanation has been made of any shortage. Under this statute an unexplained shortage of any person connected with disbursing duties is prima facie evidence of embezzle-*ment. *If the statute meant anything else the statute would be rendered absolutely meaningless."*

As a rule of evidence, an accused must undoubtedly offer a satisfactory explanation to overcome the inference of fact of unlawful conversion which arises from a shortage in his accounts, but the instruction went much beyond a statement of a permissible inference of fact and actually shifted the burden of proof from the Government to the accused. Dedrick v. State, 210 Ind 259, 2 NE 2d 409 (1936). The guilt of the accused was made to depend upon whether the court accepted the accused's explanation as satisfactory, instead of whether the prosecution established his guilt beyond a reasonable doubt. An instruction of the same kind was condemned in Duncan v. United States, 23 F2d 3 (CA 7th Cir) (1925).

In the Duncan case, supra, the accused was charged with a number of offenses, including forgery of a Government check. During the charge to the jury, the following occurred:

" 'Court: Further, gentlemen, with reference to this check, as I have stated before, the defendant Duncan admits that he had possession of it. If you believe that that check was a stolen check, and that it was found in the possession of the defendant Duncan, then, gentlemen, it becomes the duty of the defendant Duncan to explain to you, to your satisfaction, how he obtained possession of that check.

" 'Mr. Clawson: If the court please, does the court mean, by that, that the burden is on the defendant Duncan to show how he came into the possession of that check?

" 'Court: I didn't say that. But you will have an opportunity to except at the proper time.

" 'Mr. Clawson: We take an exception to that instruction, if the court means that.

" 'Court: Mr. Reporter, just read that. 'The reporter read the instruction as above set out.)

**601**

" 'Mr. Clawson: I think, your honor, that that means that the burden is on the defendant, and we except to that instruction.

" 'Court: Is there anything wrong with that, Mr. Slack?

" 'Mr. Slack: I have no objection to it, your honor.' "

The Court of Appeals held the instruction to be erroneous and prejudicial. It said:

"However, the more serious criticism of this charge is to be found in the next clause: 'Then, gentlemen, it becomes the duty of the defendant *to explain to you to your satisfaction* how he obtained possession of that check.' In a criminal case, the burden of proof never shifts. The government is required to establish its case beyond a reasonable doubt. When the evidence is sufficient to convince the jury beyond a reasonable doubt that property recently stolen is found in the possession of the accused, such accused person naturally carries the duty of explaining its possession. This, however, does not mean that in a criminal case the burden of proof shifts.

"In explaining the possession of such recently stolen property, the accused is only required to offer such a rational explanation as will raise in the minds of the jury a reasonable doubt as to his innocence. To require him to explain to the *satisfaction of the jury* is to impose upon him a burden greater than the law requires. At least, it seems to us that such language, without further explanation, was sufficient to leave with the jury the impression that the burden had shifted to the accused to *satisfy* the jury of his innocence. For innocence or guilt, upon the disclosed facts, depended upon the explanation the accused offered respecting this possession of the check. Upon this narrow issue of fact the accused was merely required to raise a reasonable doubt as to his innocence, rather than 'satisfy' the jury as to such innocent possession. We con-

clude that error was committed in giving this charge and that it was prejudicial to the defendant."

Other cases in which a permissive inference of fact was by the form of the instruction turned into a charge which placed the burden of proving innocence upon the accused are plentiful. Suffice it to cite a few. Balman v. United States, 94 F2d 197 (CA8th Cir) (1938); Vaughn v. State, 215 Ind 142, 19 NE2d 239 (1939); Stephenson v. State, 148 Tex Cr R 287, 186 SW2d 685 (1945); State v. Malone, 327 Mo 1217, 39 SW2d 786 (1931); Riegle v. State, 45 Ohio App 251, 186 NE 875 (1933); People v. Burlingame, 213 App Div 331, 210 NYS 535 (1925). True, the law officer concluded his instructions with the usual charge that the burden of proof is on the Government, and that it must establish the guilt of the accused beyond a reasonable doubt, but without correcting the error of his previous instruction, the whole instruction was, to say the least, misleading. What was said in State v. Malone, supra, is applicable here (page 790):

". . . The concluding sentence to the effect that if there is reasonable doubt of defendant's guilt he should be acquitted does not cure the fundamental error of telling the jury in clear and positive terms that the burden of proving to their satisfaction that he acted in self-defense rests upon the defendant. A lawyer might work out a construction to reconcile and harmonize that positive direction with the concluding sentence and the presumption of innocence to which defendant is entitled, but it is not likely a jury of laymen could do so. To say the best of it, the instruction was likely to be misunderstood by, and to mislead, the jury."

Accordingly, for the reason set out in the first part of this opinion, the charges are ordered dismissed.

Brosman, Judge:

Like the Chief Judge, I am of the clear opinion that reversible error was

committed by the law officer here in failing to include a reference to criminal intent in his instructions on the elements of the offense. However, there he and I must part company, for I am in agreement with most other portions of Judge Latimer's opinion.

II

The origin of 18 USC § 643, the object of our primary concern here, is found in 12 Stat 593, chap 199 (1862), which required the rendition of monthly accounts by officers entrusted with public moneys. However, as early as 1820, Congress had enacted legislation providing for distress warrants against such a person, who "shall fail to render his account, or pay over the same in the manner, or within the time required by law." 3 Stat 592, Chap 107 (1820). Thereafter, in 1846, a general statute took effect, which, *inter alia*, required depositaries of public funds to "make returns to the treasury and post office departments of all moneys received and paid by him, at such times and in such form as shall be directed by the Secretary of the Treasury or the Postmaster General." 9 Stat 59, chap 90, § 10 (1846). That same law provided that any failure to pay over, or to produce, public moneys entrusted to an officer charged with their keeping, should be prima facie evidence of embezzlement. For the purpose of showing an adverse balance against the officer, it would suffice merely to produce a transcript from the books of the Treasury—and refusal to pay a draft drawn on the person charged with the possession of public moneys, or a failure to transfer or disburse any such moneys on proper direction, would also constitute prima facie evidence of embezzlement. It was further directed that an accurate entry be made of each sum received, and of each payment or transfer effected by, a person entrusted with public funds. Idem. § 16.

While failure to render accounts might, under this general embezzlement legislation, have been sufficient to take the case to the jury, and to permit a conviction of embezzlement, Congress appears to have decided that, in enforcing the duties of public officers, it should go further. Accordingly, the 1862 legislation provided that accounts and supporting vouchers were to be mailed to the Treasury within ten days following the end of the month, and that, in the event of non-receipt, the officer whose accounts appeared to be in default was required to furnish "satisfactory evidence" of having, in fact, rendered such accounts. In case of default he would be subject to the penalties of the general embezzlement statute. 12 Stat 593. Thus, after 1862, the failure to render an account constituted more than a possible basis for a permissive inference, which would serve to take the case to the jury under an embezzlement indictment. In addition, the jury was *bound* to convict of embezzlement—unless the accused public officer offered "satisfactory evidence" that he had rendered an account. As a result, the issue under 12 Stat 593 became: Where are the *accounts*, rather than: Where are the *public moneys*?

In 1878 this legislation was carried into the Revised Statutes with virtual completeness. Rev Stat § 3622 required the monthly statement of accounts, and stated that:

"... In case of the nonreceipt at the Treasury or proper Bureau of any accounts within a reasonable and proper time thereafter the officer whose accounts are in default shall be required to furnish satisfactory evidence of having complied with the provisions of this section."

No criminal penalties were provided in this section, but a cross-reference was made to Rev Stat § 5491. This latter section provided:

"Every officer or agent of the United States who, having received public money which he is not authorized to retain as salary, pay, or emolument, fails to render his accounts for the same as provided by law shall be deemed guilty of embezzlement and shall be fined in a sum equal to the amount of the money embezzled and shall be imprisoned not less than six months or more than ten years."

**603**

Cross-references were given to Revised Statutes §§ 3622, 3633—the latter providing for distress warrants against disbursing officers who had failed to account. Related sections were: Rev Stat § 3623, requiring all persons receiving public moneys to "render distinct accounts of the application thereof, according to the appropriation under which the same may have been advanced to them"; and Rev Stat § 3625, authorizing the stating of an account, and the issuance of a distress warrant thereon, on failure of an "officer who has received the public money" to "render his account, or pay over the same in the manner or within the time required by law."

Rev Stat § 3622 has become 31 USC § 496, which continues the rule that "the officer whose accounts are in default shall be required to furnish satisfactory evidence of having complied with the provisions of this section." Authority also remains for the issuance of distress warrants against an officer holding public moneys who fails "to render his accounts, or to pay over" any sum remaining in his hands. 31 USC §§ 506, 514.

Scrutiny of the legislative background of 18 USC § 643, together with other considerations, leads me to conclude that much more is required than a pro forma type of account prepared without regard to accuracy. For instance, as early as Rev Stat § 5491, a reference was made to the rendition of accounts "as provided by law." And subsequent to the general embezzlement statute of 1846, *accurate* entries were required by law as to each sum received and as to each disbursement. In 31 USC § 496, and its predecessor 12 Stat 593, the officer is required to render accounts, together "with the vouchers necessary to the *correct* and prompt settlement thereof." (Emphasis supplied.) Thus, the sibling of 18 USC § 643 contains the concept of accuracy—for without accurate and complete vouchers and accounts, there can be no "correct" settlement. Moreover, some notion of accuracy was envisaged in all the statutes previously referred to—this for the reason that accounts rendered were to be audited

in the Treasury as a preliminary to "stating an account," which might be used either as the basis for a distress warrant, or to support an embezzlement prosecution against the person concerned. I am sure that there is an implicit assumption in all of this legislation that, to satisfy the requirement of "rendering an account," the account must be accurate enough to pass muster in a Treasury audit.

Under a view that Congress, where otherwise silent, must have intended the edifice of criminal legislation to be as homogeneous as possible, I advert to 18 USC § 1421, which provides a penalty of five years imprisonment for a person who "willfully neglects" "a duty to render *true* accounts of moneys received in any proceeding relating to citizenship, naturalization, or registration of aliens." (Emphasis supplied.) Similarly, 38 USC § 556a demands "*proper* accountings" by fiduciaries. (Emphasis supplied.) These statutes seem to me to make explicit the requirement of accuracy and truthfulness I find implicit in 18 USC § 643, the legislation with which we are concerned in the case at bar. All in all, I cannot bring myself to accept the suggested view that the presentation of what purports to be a true account, but is not, constitutes compliance with 18 USC § 643. Such a construction simply puts a premium on meaningless form. Moreover, so far as I can tell, this construction could result in a penalty of ten years' confinement for failure to render *any* account, whereas, under 18 USC § 1001, a maximum of only five years is present for application to one who submits a *palpably false* account. Yet I would incline to regard the latter dereliction as, if anything, more serious than the former—and so I feel sure would the Congress. Thus, I am in accord with Judge Latimer in this branch of the case.

### III

Though I conclude that a person holding public moneys must submit accurate accounts, failure to do so ■■■■■■ must, in my view, be willful to create criminal liability under 18 USC § 643. It has

been determined that criminal intent—*mens rea*—is a required element in an embezzlement prosecution under 18 USC § 641. Morissette v. United States, 342 US 246. Since 18 USC § 643 states that a violator is "guilty of embezzlement," I consider that the Supreme Court's interpretation of the general embezzlement section is, to say the least, exceedingly persuasive. I note, too, that both 18 USC § 1421 and 38 USC § 556*a*, in dealing with embezzlement by certain types of fiduciaries require *"willful* neglects" of the duty to render accounts. (Emphasis supplied.)

Concerning the proof of the required willfulness, I am convinced that 18 USC § 643, like its predecessor, 12 Stat 593 (1862), supra, placed on the accused a burden of producing "satisfactory evidence" of innocent intent—once the prosecution has established failure to render any account, or the rendition of an account which in some significant respect is untrue. Actually this evidence, to be "satisfactory" from the accused's standpoint, need only generate a reasonable doubt in the minds of the members of the court-martial. Yet, of course, they are permitted to disbelieve that evidence entirely and conclude that the accused was willful in his conduct.

Since willfulness is an element of the crime under 18 USC § 643, I unhesitatingly conclude that ▮▮▮▮▮▮▮ it must be the subject of instructions, like any other offense element. In the instant case the absence of willfulness was the crux of the defense; and defense counsel—as indicated in the appellate exhibit describing his request for instructions—made it abundantly clear that he wished the law officer to advise the court on the subject of intent. Moreover, I cannot avoid the suspicion that the comparatively light sentence—and particularly the retention of the accused as an officer of the United States Navy—reflect some uncertainty on the court's part as to the exact nature of the offense of which its members had convicted him. Thus, I find myself in agreement with the conclusion of the Chief Judge here. Manifestly there was prejudicial instructional error in this case.

IV

Finally—and here I am unlike both of my colleagues—I meet insuperable difficulty in believing that ▮▮▮▮▮▮ the specification in the case at bar sufficed to charge a violation of 18 USC § 643, in the face of a complete failure to include anything which by any stretch of the imagination may be said to amount to an allegation of willfulness. Morissette v. United States, supra, fn 30; United States v. Carll, 105 US 611, 26 L ed 1135. Not only must willfulness be shown by the evidence, but it must also be the subject of appropriate instructions and must be found by the court-martial. It must as well, I am sure, be alleged. The Manual for Courts-Martial itself requires the presence of words importing criminality. Paragraph 28*a*(3). Admittedly the specification included the citation of the Federal statute relied on by the accuser, and in doing this it conformed to the optimum Federal practice. Federal Rules of Criminal Procedure, Rule 7(c). However, the recitation of a statute involved is not a necessary part of an indictment, and does not add to nor weaken the legal effect of the allegations contained therein. United States v. Lynch, 180 F2d 696 (CA7th Cir), *cert denied* 339 US 981, 94 L ed 1385, 70 S Ct 1029; Morland v. United States, 193 F2d 297 (CA10th Cir). Even following the words of a statute in an indictment does not suffice—unless, indeed, the words used set forth fully all of the essential elements of the offense. Lowenburg v. United States, 156 F2d 22 (CA10th Cir). This, 18 USC § 643 does not do, for the reason that it omits any statement of the requirement of willfulness.

My understanding of the action of the Chief Judge is that he has voted to dismiss the charges in this case. For different reasons—that is, for those set out in this section of the present opinion—I must join him in this. Of course, this dismissal must, in my view, be without prejudice to further proceedings against the accused under a proper charge and specification.