UNITED STATES, Appellee

v

ANGELO F. DeMARIA, Sergeant, U. S. Army, Appellant

6 USCMA 585, 20 CMR 301

No. 6555

Decided December 21, 1955

*Major Edwin Doran* argued the cause for Appellant, Accused.

*First Lieutenant Robert L. Taylor* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant Lewis W. Evans*.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was convicted of three violations of the Uniform Code of Military Justice resulting from an attempt to exchange outdated military payment certificates for certificates of a new series. He was sentenced to a bad-conduct discharge, total forfeitures, and confinement at hard labor for one year and six months. Two questions are presented for review: (1) The sufficiency of the evidence to support the findings of guilty, and (2) the admissibility of certain evidence.

The specification of Charge I alleged that the accused conspired on May 28, 1954, with a Corporal Robert A. Powell and Sergeants Louis Bethune and John C. Leonard to "accept and convert" about $1,000.00 of series 481 certificates, obtained from a Japanese National, to a like amount of series 521 certificates, after May 25, 1954, the date designated by the Secretary of the Army for the "acceptance and exchange" of such certificates, in violation of paragraph 10*d*, Army Regulations 35–510, dated November 1, 1951. The court-martial found the accused not guilty of the allegations regarding the participation of Sergeants Bethune and Leonard in the conspiracy and of the allegation that the series 481 certificates had been obtained from a Japanese National. However, the court found the accused guilty of the remaining allegations of the specification. Charge II alleges that the accused violated paragraph 10*d* of the same regulation by "unlawfully accepting" the series 481 certificates from Corporal Powell "after 25 May 1954, the date designated by the Secretary of the Army for their acceptance." Charge III states that on May 28, 1954, the accused attempted to violate the regulation by "attempting at the Tokyo Finance Office to exchange" series 481 certificates into series 521 certificates

after "the date designated by the Secretary of the Army for their exchange."

Paragraph 10*d* of AR 35–510 reads as follows:

"*d.* Under no circumstances will authorized personnel or disbursing officers accept military payment certificates from, transfer military payment certificates to, or exchange military payment certificates for persons other than authorized United States personnel, or accept or exchange military payment certificates after the date designated by the Secretary of the Army for their acceptance or exchange."

The court-martial took judicial notice of the regulation. It was also allowed to take notice "of the fact that the Secretary of the Army designated the date, as the time for the conversion of old Military Payment Certificates, as 25 May 1954." Defense counsel objected to judicially noticing the date without some proof of the source and the details of the designation. The objection was overruled and the request denied.

At 1:05 p.m. on May 25, 1954, First Lieutenant William L. Smith, an officer in the accused's detachment, was called to the commander's office. There, he listened to the concluding minutes of a radio broadcast on "this conversion notice." When the broadcast ended, Lt. Smith was ordered to post guards at all exits to the Finance Building and to instruct them to permit no one to leave and "no unauthorized personnel" to enter except for the purpose of converting certificates. These orders were accomplished. Additionally, a copy of a notice from Headquarters, Central Command, a superior organization in the same chain of command as the accused's detachment, was signed by the detachment commander and posted on the detachment bulletin board. Over defense objection, an unsigned and unauthenticated mimeograph form pur-

**587**

porting to be "a notice that was to be posted on the bulletin board" was admitted in evidence. In pertinent part the notice reads as follows:

"HEADQUARTERS
CENTRAL COMMAND
APO 500

TO BE POSTED ON UNIT
BULLETIN BOARDS

1. Effective immediately and until 2000 hours today military payment certificates must be turned in in exchange for new. Except as stated in paragraph 8, below, all MPCs must be turned in by 2000 today.

2. All military facilities (PX's, clubs, messes, post offices, banks, etc.) are prohibited from accepting old currency after 1300, 25 May.

3. Be sure and turn in all of your money. You cannot spend it, and will lose it if you do not turn it in.

. . . . .

7. If you are married see your commanding officer or first sergeant about permission to go home and get MPC's in possession of your dependents. You will inform your C. O. or 1st Sgt. of the approximate amount of MPCs held by your dependents. Only one conversion can be made per family unless you have a dependent who is a wage earner. In the latter case your dependent can convert her MPCs at her place of duty.

. . . . .

9. It is a court martial offense to turn in MPCs belonging to any other person.

As of 1300 hours, 25 May 1954 this document is regarded UNCLASSIFIED per par 21i, AR 380-5

. . . . . . . . . .
Commanding Officer."
(Unsigned)

Lt. Smith and another officer were designated as collecting officers for the purpose of receiving old series certificates. They set up two tables, one in the detachment orderly room, and the other in Lt. Smith's office. At about 3:00 p.m., they started collecting old certificates from detachment personnel. In return, they issued appropriate receipts which would later be exchanged for current certificates. Lt. Smith had no knowledge of other regulations pertaining to the conversion.

Captain Sebastian Marin, Finance and Accounting Officer for Headquarters, Central Command, also testified regarding the conversion procedures. He said that May 25 was the "initial date" for the change-over. However, there was also a general five-day period of grace. In fact, he testified that at the time of trial, his command was still converting money. The command had not received the designation of conversion directly from the Secretary of the Army but it had received a letter from Headquarters, Army Forces Far East, directing "implementing action." The latter directive authorized a grace period for conversion from May 25 to May 30. The grace period was "designed for countless reasons," as for example, "People that neglected to get them [the old certificates] out of a pocket." The Army Forces letter was dated June 1, but, as appears from the relevant parts set out below, it purports to regulate conversion procedures up to May 30 as well as the procedure after that date.

"HEADQUARTERS
UNITED STATES ARMY FORCES,
FAR EAST
APO 343

AG 123.7 FI 1 June 1954

SUBJECT: New Series Military Payment Certificates

TO: * * * * * * * * *
Commanding General, Central Command, APO 500
* * * * * * * * *

. . . . . .

2. Series 481 Military Payment Certificates will not be accepted by Finance Officers for conversion subsequent to 30 May 1954 without prior approval of this headquarters. All requests for conversion of series 481 Military Payment Certificates subsequent to 30 May 1954 will be submitted in writing through appropriate command channels to this headquarters, Attn: Finance Officer, for consideration. Recommendation for

approval or disapproval will be made at each echelon of command. Military Payment Certificates in question *will not* be forwarded with application for conversion but will be retained by the individual concerned."

The Army Forces letter refers to two earlier documents. One is a letter from the same headquarters, dated May 20, 1954, relating to "New Series Military Payment Certificates." Nothing of the contents of this letter is in the record. The second document is Special Instructions No. 3, Headquarters, Far East Command, dated March 8, 1954. The court-martial took judicial notice of the provisions of these instructions. In essence, they prescribe the procedures for conversion, but they do not mention a date of conversion.

According to the instructions issued by the Central Command to its subordinate units, individuals were required to convert their certificates through collecting officers in their own organizations. If an individual appeared personally at the Finance Office, the clerk was instructed to direct him to return to his own collecting officer. The collecting officer collected old series certificates, which he then turned over to the Finance Office for new series bills. These were in turn given to the individuals who had surrendered old bills. According to Captain Marin, collection and conversion were valid during the grace period from May 25 to May 30. However, on May 28 "payment" for "a service" would have to be made in new currency. Captain Marin further testified that, in his opinion, no regulation would be violated if, even at the time of trial, an individual approached the Finance Officer or a collection officer to request conversion of old certificates. If he doubted that the old certificates had been legitimately acquired, he would, in accordance with applicable instructions, refer the application to a board of officers for a ruling on whether or not to permit the exchange. Thus, in a hypothetical case, posed by trial counsel, in which "A" gave "B" $1,000.-00 in old series certificates for the purpose of conversion, Captain Marin would have required an explanation as to how the money was obtained. He would particularly require an explanation because a sergeant would not ordinarily "be hauling around" one thousand dollars. If he believed that the certificates had been illegally acquired, he might hold them or detain the applicant.

On May 27, 1954, Private First Class John N. Franzen met Sergeant John C. Leonard. Leonard asked Franzen if he knew where he could "cash some scrip." Franzen replied that he did not, but he had heard a rumor which indicated a possible source at the Finance Building. Later that day, Leonard introduced a Sergeant Bethune to Franzen. Bethune gave Franzen five hundred dollars ($500.00). They proceeded to the Finance Building and attempted to locate someone who could "cash some scrip." They made one abortive attempt. Then, they met Corporal Powell in a room in the Finance Building. Powell was asked if he could cash "some military scrip." He replied that he could. After an undisclosed interval during which the group seems to have separated, they gathered in the mess hall and "talked about changing the military scrip."

Powell was called as a prosecution witness. He was asked if on May 28, 1954, he gave the accused "one thousand dollars MPC." He answered, "Yes." At that point, the accused's individual counsel interrupted. He noted that he was also Powell's counsel and he believed that Powell did not understand his privilege against self-incrimination. A recess was declared to permit counsel to confer with Powell. When court reconvened, Powell refused to answer other questions concerning his transactions with the accused on the ground that his answers might incriminate him. The law officer sustained his refusal, and Powell was excused as a witness. Defense counsel moved to strike the single answer that Powell had given. The motion was denied. The correctness of this ruling is one of the issues upon which we granted review.

Other evidence in the case consists of a stipulation of expected testimony by a finance clerk, testimony by a Criminal Investigation Division Agent, and a pretrial statement by the accused. The first is to the effect that on May

28, the accused appeared at Corporal M. Goldsmith's cashier stand in the Tokyo Finance Office. He inquired "whether he could convert one thousand dollars" in series 481 certificates to the new series 521. Goldsmith asked the accused to wait. He notified his superior officer and "turned the thousand dollar Series 481 Military Payment Certificates over to him." As far as the agent is concerned, he testified that he was informed that the accused was at the Finance Office attempting to convert old certificates for new. He went to the Finance Office and saw the accused standing at the cashier's window, "signing bills." Article 31 was read and explained to the accused and he was advised that he was being investigated in connection with "illegal monetary transactions." The accused told the agent that he had saved the military payment certificates during his stay in the Far East, and that he kept them "in his footlocker." The agent confiscated the certificates. The next afternoon, the accused was again advised of his rights under Article 31. He made an oral statement which the agent reduced to writing. The written statement was signed by the accused. It was admitted in evidence. It reads as follows:

"On 25 May 1954 I received my orders for return to the Zone of Interior. After receiving my orders, I started to leave the Finance Building to go out to see my girl friend at which time some one informed me that the Military Payment Certificates were being converted at that time. I had no money to convert, so I continued to my previous destination.

"On 28 May 1954, while sitting in the Tokyo Service Unit Mess Hall at the Finance Building, Cpl POWELL, a cook in my organization, asked me if I had ten dollars ($10.00) to loan him, at which I answered that I only had ten dollars ($10.00) and didn't feel that I could loan it. At this time he asked me if I would like to borrow ten dollars ($10.00) and produced a large pack of Military Payment Certificates, Series 481, from his pocket. At this time he told me that if I knew anybody that could cash them for him or could cash them myself, it would be worth two hundred fifty dollars ($250.00) to me. I took all of the Series 481 Military Payment Certificates in his possession at the time which he said was one thousand dollars ($1,000.00) and went to the personnel section to ask if I could cash it. I was told I would have to go to the Finance Office to convert this money into the new series MPC. I then went to the Finance Office in downtown Tokyo, Japan and tried to convert this money into the new series MPC.

"Q. Do you know where Cpl POWELL got the one thousand dollars ($1,000.00)?

"A. No. He just told me that some guy gave it to him and if I could cash it for him, he would give me two hundred and fifty dollars ($250.00).

"Q. Did you know that it was unlawful for you to exchange MPC for another person?

"A. No.

"Q. Do you have anything that you would like to add or detract from this statement?

"A. No."

As previously noted, each of the offenses of which the accused was convicted alleges a violation of paragraph 10d, AR 35-510. That paragraph has two parts; one prohibits certificate transactions between authorized and unauthorized personnel; the other forbids the acceptance or exchange of certificates "after the date designated by the Secretary of the Army for their acceptance or exchange," without regard to whether the parties are or are not authorized. Of the three offenses, only Charge I alleged the acceptance of certificates from an unauthorized person, an unnamed Japanese National. See: AR 35-510, paragraph 3c. The court-martial, however, returned a finding of not guilty as to this allegation. Consequently, to support the accused's conviction on each charge, the evidence must show that he violated that part of paragraph 10d which prohibits certificate transactions after the date designated by the Secretary of the Army.

It appears that on May 28 the accused accepted military payment certificates series 481 from Corporal Powell. It is also clear that he accepted the certificates for the purpose of exchanging them into certificates of the 521 series. Moreover, the evidence shows that the accused went to the Tokyo Finance Office and attempted to exchange the old certificates. The remaining question, therefore, is whether these acts took place after the date designated by the Secretary of the Army.

The court-martial took judicial notice that the Secretary of the Army had designated May 25 as "the date for conversion of old Military Payment Certificates." However, although vigorously requested by defense counsel, no evidence of the terms of the designation was presented. The accused contends that this Court should and, in justice to the accused, ought to take judicial notice of the conversion procedures provided by the Secretary in connection with his designation. There is substantial merit to the accused's argument; at the same time it presents serious problems.

As far as applicable here, paragraph 10*d* is not self-executing. It requires a declaration by the Secretary to make it effective. Consequently, the terms of the declaration are important. They may, for example, confine the critical date to a single day or extend it over a period of days; or they may relate to either acceptance or exchange of certificates, but not to both. In fact, it is not at all clear that the "time for conversion of old Military Payment Certificates," the "fact" which was judicially noticed by the court-martial, applies to acceptance of certificates as well as to the exchange of certificates. Actually, therefore, the terms of the designation define the offense. It is certainly appropriate to consider the provisions of the designation. However, the messages relating to the conversion date are addressed to designated commanders. Without evidence of their further and general dissemination, they are more in the nature of a letter than the kind of service or area-wide publication which is a proper subject for judicial notice. Cf. United States v Williams, 6 USCMA 243, 19 CMR 369. On the other hand, if we decline to notice the messages, justice to the accused would require consideration of the merits of his claim that judicial notice should not have been taken of the date of the declaration. We need not, however, consider these alternatives in the form in which they are presented. If the law officer erred in allowing the court-martial to take judicial notice of the Secretary's designation, then the remaining evidence is insufficient to support the findings of guilty. Conversely, if the law officer was correct in his ruling, the provisions of the designation became as much a part of the record of trial as did the "date . . . for the conversion of old Military Payment Certificates." Cf. United States v Walters, 4 USCMA 617, 16 CMR 191.

The message which designates May 25 as conversion day refers to and incorporates an earlier message. The latter describes the procedure to be followed for the withdrawal of series 481 and the introduction of series 521. Several provisions of this message are important here. They may be grouped as follows:

1. Implementing conversion procedures "will be effected by headquarters CGAFFE and headquarters USAREUR only." "Comprehensive announcements . . . will be made by all available media."

2. Effective 0400Z (Greenwich civil time) on "C" day, new series 521 "will be the only medium of exchange within the U. S. military establishment."

3. Only authorized personnel will be permitted to convert military payment certificates of old series. Only one conversion per person will be permitted. To preclude loss to the United States as the result of any counterfeiting which might be uncovered, personnel turning in 5- and 10-dollar military payment certificates will be required to endorse their name, rank or title, and serial number.

4. Certificates in excess of $500.00

presented by individuals will not be accepted for conversion until legitimate acquisition of the certificates is verified. Conversion of excessive amounts will not be effected until proof of authorized source is conclusively verified.

5. A grace period of between "C" day plus one day and "C" day plus five days is authorized for personnel who, "under extenuating circumstances, without inadvertence on their part," are unable to convert during the prescribed hours on "C" day. Conversion during grace period will be made on written request submitted in writing by the commanding officer. After the grace period, applications will be submitted in writing through channels to headquarters CGAFFE who is authorized to approve or disapprove applications up to 180 days after "C" day. Applications thereafter will be referred to the Department of the Army, Office of the Chief of Finance.

Analysis of the messages, the implementing Army Forces Far East and Central Command directives, and the testimony of Captain Marin makes plain that the conversion designation had two consequences. The first concerned the acceptance of series 481 certificates, and the second related to the exchange of such certificates into bills of the new series 521.

After May 25, 1954, "0400Z (Greenwich civil time)," series 521 certificates were constituted as the "only medium of exchange." Inferentially, the designation also prohibited acceptance of series 481. No army personnel could thereafter legally accept a series 481 certificate as a medium of exchange. However, the accused, did not accept series 481 certificates as a medium of exchange. The evidence unmistakably shows that he accepted the certificates from Corporal Powell as his agent for the purpose of exchanging them for series 521 certificates. The question then is whether the Secretary's prohibition and the regulation which it complemented are broad enough to prohibit acceptance of 481 certificates for any reason whatever. For example, after

the designation was it unlawful to accept outdated certificates for safekeeping, until the owner could lawfully convert them? Or was it unlawful to accept certificates as a messenger for the purpose of bringing them to the owner?

Paragraph 10d of the regulation is phrased in absolute terms, that is, its language seems to prohibit every kind of an acceptance after the date of declaration by the Secretary of the Army. Moreover, it makes no direct mention of criminal intent as an essential element of the offense. The omission, of course, does not necessarily mean that even a good faith acceptance of an outdated certificate would constitute a violation of the regulation. See: United States v Doyle, 3 USCMA 585, 14 CMR 3. However, we need not reach that question. We have already noted that so far as applicable to this case the regulation is not self-operating; it requires a designation by the Secretary of the Army to make it complete. Essentially, therefore, the terms of the designation define the metes and bounds of the prohibited acts. How far then did the Secretary go in prohibiting acceptance of series 481 certificates?

Significantly, the provisions of the designation do not expressly prohibit acceptances of every kind. They merely prohibit acceptance as "a medium of exchange." As a matter of fact, the implementing notice of the Central Command specifically recognizes at least one situation in which authorized personnel may accept old certificates from other authorized personnel for the purpose of conversion. In our opinion, a person who accepted certificates from another as his agent for the purpose of converting them did not violate the regulation, as defined by the Secretary's designation. Here, the evidence shows that the accused accepted the certificates from Powell only as an agent for the purpose of effecting an exchange, in accordance with standard procedures.

Undoubtedly, an offer of $250.00 for services in effecting an exchange of one thousand dollars ($1,000.00) should give rise to suspicion as to the propriety of

the transaction. Certainly, the court-martial was justified in believing that the accused entertained such suspicion, particularly if it believed that the accused originally lied to the Criminal Investigation Division agent in accounting for his possession of the certificates. But the accused's suspicion and the falsity of his explanation do not by themselves establish an unlawful agreement to accept, and an unlawful acceptance of, old series certificates. Apart from the question of an accompanying criminal intent, the acceptance of series 481 certificates was prohibited only in connection with its use as a medium of exchange. Other kinds of acceptances were not forbidden. Consequently, acceptance of certificates by the accused from authorized personnel for the purpose of exchanging them in accordance with regular conversion requirements did not violate paragraph 10*d* and the complementary provisions of the Secretary's designation.

Possibly the accused violated the Central Command's order making it "a court martial offense to turn in MPCs belonging to any other person." However, he was not charged with that offense, and any such violation is not before us. Parenthetically, we note that, from the evidence, it may be doubted that the accused had knowledge of the order. See: United States v Arnovits, 3 USCMA 538, 13 CMR 94.

The second part of the regulation and Secretary's designation relate to the exchange of series 481 certificates. Of course, it was essential to permit conversion of old certificates to new certificates; otherwise, the order invalidating the old series as a medium of exchange would have constituted a taking of property without due process of law.

According to the Secretary's designation and the implementing directives, an exchange could be effected at any of several different times. Somewhat different procedures obtained for each period, but the important fact is that it was legal to apply for an exchange during any of the periods. True, the applicant could be required to show the legitimacy of his acquisition as a condition of exchange, but the presentation of certificates for conversion did not violate the provision of the Secretary's designation. Here, the accused attempted to exchange old certificates during the five-day grace period. The certificates did not belong to the accused. He may, therefore, have violated paragraph 9 of the implementing directive of the Central Command. But, as we have already indicated, he was not charged with that offense, and evidence of a violation of that order is not sufficient to support the findings of guilty as to the offense charged. As far as that offense is concerned, the evidence shows that the accused attempted to make the exchange during a lawful period and in compliance with the instructions of finance personnel. Undeniably, therefore, the accused was acting in conformity with, not in violation of, the regulations and the Secretary's designation.

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside, and the charges are ordered dismissed.

BROSMAN, Judge (concurring in the result):

I concur in the result reached by the Chief Judge, but I cannot escape certain reservations touching his attitude toward this Court's concept of judicial notice.

As I understand the opinion, it suggests that the implementing messages from the Secretary of the Army, as well as the directives distributed to subordinate commands by the Far East Headquarters, do not constitute appropriate subjects of judicial notice. Yet, the current Manual for Courts-Martial provides explicitly that the contents of official publications of the departments and commands under the Department of Defense—including orders, bulletins, circulars, and the like—need not be established by the formal presentation of evidence. Paragraph 147*a*. Indeed, the doctrine of judicial notice may be invoked as to a document issuing from one of the service departments despite the fact that no extract

therefrom is attached to the record of trial. Paragraph 147*a*, supra. Moreover, this Court has specifically held that messages from the Commanding General of the very Headquarters, which issued one of the implementing bulletins before us here, may be noticed judicially. United States v Williams, 6 USCMA 243, 19 CMR 369. I am therefore unable to find any sort of valid reason for rejecting the doctrine with respect to the messages now under consideration. I much prefer to bottom my concurrence on this approach rather than on the theory—artful but unnecessary—utilized in Judge Quinn's opinion.

LATIMER, Judge (dissenting) :

I dissent.

This is a relatively simple case of an accused being charged with a number of offenses because of his willingness to become a pawn in the hands of others dealing in contraband money. He was convicted of three separate specifications which grew out of one illegal transaction of accepting and attempting to convert old military payment certificates. All charges were based on violation of paragraph 10*d*, Army Regulations 35-510, dated November 1, 1951. The first specification alleged that accused conspired with certain other named individuals to unlawfully convert $1,000.00 in old military payment certificates to a like amount in a new series after the cutoff date for conversions set by the Secretary of the Army. The second specification charged an unlawful acceptance on the same date of about $1,000.00 in the old series from Corporal Robert A. Powell. The last specification set out an unlawful attempt to convert the certificates by endorsing them preparatory to presenting them for exchange.

In so far as it is relevant to the present issue, paragraph 10*d*, AR 35-510, of the above-mentioned date, provided, "Under no circumstances will authorized personnel . . . accept or exchange military payment certificates after the date designated by the Secretary of the Army for their acceptance or exchange." To complete the Depart-

ment of the Army regulatory picture, the Secretary of the Army set May 25, 1954, as the conversion date. The offenses alleged in the specifications were committed, if at all, some three days thereafter, particularly on May 28, 1954.

As is noted above, paragraph 10*d*, AR 35-510, supra, places on the shoulders of the Secretary of the Army the duty to set the exchange date. However, Headquarters, United States Army Forces, Far East, was authorized by him to issue implementing conversion instructions. It issued some directions, and these were projected into the case by the accused, but they afford him no greater comfort than do those promulgated by the Secretary of the Army. I will, therefore, deal principally with the Secretary's letters of April 30, 1954, and May 13, 1954, as they contain the essential directives for conversion. These are the provisions which I consider of importance:

". . . In view of long period of time present military payment certificates series has been in circulation, appropriate action should be taken to ensure no disclosure is made that conversion is imminent to preclude unauthorized personnel circumventing objectives of conversion. . . . Public announcement of withdrawal of 421 series military payment certificates will not be made prior to Greenwich Civil Time 0400Z hours on 'C' day. Comprehensive announcements through official and public channels will be made by all available media. . . . Withdrawal of 481 series military payment certificates will be effected prior to Greenwich Civil Time 1100Z hours 'C' day. Effective Greenwich Civil Time 0400Z hours 'C' day, new series 521 military payment certificates will be the only medium of exchange within the U. S. military establishments. Issue of new series 521 military payment certificates will be effected as soon after Greenwich Civil Time 0400Z hours 'C' day as possible. Only authorized personnel will be permitted to convert military payment certificate holdings. Only one conversion per person will be permitted. Authorized personnel

594

with dependents will be allowed one conversion per family except where members of family, other than head, are wage earners. . . . A grace period between 'C' plus one day and 'C' plus five days inclusive will be allowed for conversion of old series 481 military payment certificates for authorized personnel who, under extenuating circumstances, without inadvertence on their part, are unable to convert the military payment certificates during the prescribed conversion hours on 'C' day. Conversions during this grace period will be effected by disbursing officers upon receipt of satisfactory written request, substantiated in writing, by commanding officers."

The plan of exchange on "C" day, as outlined in these letters and other official documents, was relatively straightforward. Finance officers were prohibited from making individual exchanges of personal funds. These exchanges were to be handled through unit officers. At least one designated collecting officer was appointed in the smaller units. In the case of the unit with which we are concerned, two were appointed. These officers were required to accept the old military payment certificates and execute a receipt to the owner. The conversion period was to start at 1:00 p.m., Tokyo Standard Time, and end at 8:00 p.m. on the same day. A delay of several hours between the time the old certificates were turned in to the collecting officers and their return of new certificates was contemplated, as they were required to effectuate the transfer with the appropriate finance officer. According to one officer witness, the plan, as it was operated in the command to which accused belonged, started at 3:00 p.m. and ended at 1:30 a.m. the following morning. The details of the conversion procedure were announced to the personnel of that unit over the loudspeaker system and by posting written instructions on the unit bulletin board. The plan envisaged a complete conversion of all outstanding certificates on the one designated day, except in those instances where unusual circumstances made it impossible for the owner to obtain possession of his money within the stipulated time period. In that event, an entirely different method of converting the old money was prescribed.

## II

The accused, among other contentions, complains vehemently that the Government adopted a ■■■■■■ method of proving its case which resulted in the court-martial judicially noting only part of the official records. To escape that criticism, even though unwarranted, I am going to consider every written regulation, letter, or other official document which he asserts might be beneficial to his cause, in spite of a record which discloses he did not rely on some of them or request their consideration at the trial level. But accused goes one step further and bottoms his assertion upon another contention to the effect that he cannot be charged with knowledge of secret official documents and that the court-martial, by taking judicial notice of the date of conversion, legally charged him with information he could not possibly know about. The short answer to the last contention could be that accused acknowledged that he knew the conversion date, but, to clarify the atmosphere on judicial notice, I make the following observation. The Manual for Courts-Martial, United States, 1951, provides that regulations and official publications of the Department of the Army may be judicially noticed, and, when I measure this record by that provision, I find there is no question about the propriety of the court's taking judicial knowledge of the only matter of importance to this decision. It is to be noted that the Secretary of the Army, in order to prevent counterfeiting and manipulations which might result in a loss to the Government, sought to avoid a premature disclosure of the date of conversion. For that reason, when his instructions were transmitted, they were classified as secret. Of course, AR 35-510, supra, was not classified and it is the basic source of prosecution in this instance. Obviously, if secrecy of the proposed change in currency was to be maintained, the date and the exact

details of conversion could not be published until just before the plan was to be placed in effect. But this did not preclude the formulation and preparation of specific details. These were worked out, reduced to writing, and classified as secret documents. However, when the alert was given, the prior prepared plans were immediately declassified and made public. In the case of accused's unit, the time, place, and method of conversion were advertised commencing 1:00 p.m. on May 25, 1954, by posting the information on the bulletin board and by broadcasting it over the loud-speaker system. The accused, in a pretrial statement, conceded knowledge of the date of conversion, and, therefore, the only relevant items which were judicially noted, without being otherwise proven, were the provisions of Army Regulation 35-510, prohibiting acceptance and conversion of the certificates, and that the selection of May 25, 1954, as the conversion date was an official act by the Secretary of the Army. Both of those pieces of evidence were proper subjects of judicial notice.

### III

With those matters properly in the record, this is the evidentiary framework as I see it. Both the acceptance and conversion of military payment certificates were prohibited after May 25, 1954. Three days later, the accused accepted $1,000.00 worth of certificates for the purpose of converting them for some unidentified persons who were unwilling to accept the risk of violating the law. For his efforts, he was to receive $250.00, a rather substantial sum for an act which my associates find legal. He proceeded to the personnel section of his unit with the prohibited currency in his possession, intending to convert the old money into the new medium of exchange. He was informed that he would have to consult a finance officer, and he thereupon sought out the one located in Tokyo. He was in the course of signing his name and serial number to the certificates, as required by the converting directives, when he was apprehended. As evidence of his consciousness that he

was violating the law in his attempted conversion, it was shown that he first contended the money was earned by him and had been secretly cached away in his footlocker, and then, when the chain of circumstances tightened, he admitted being offered twenty-five per cent of the face value of the certificates if he succeeded in converting them.

A majority of the Court reach the conclusion that no offense is established because included in the letter from the Secretary of the Army is a provision that "Effective Greenwich Civil Time 0400Z hours 'C' day, new series 521 military payment certificates will be the only medium of exchange within the United States military establishment." The author Judge reasons from that provision that only transactions which partake of being in the usual course of business are prohibited, and, as this accused did not accept the certificates as a medium of exchange, he is not guilty of violating the regulation. Overlooked entirely in that mental process are matters such as these: The unqualified proscription by Army Regulations; the undeniable right of the Government to control the free flow of temporary money; the fact that the provision of the letter was required, for it served the very useful purpose of authorizing military establishments such as post exchanges, officers' and noncommissioned officers' clubs, and licensed banks to cut off acceptances in sufficient time to permit them to make their conversion; the rule of statutory construction that the regulations and orders should be construed in the light of the purposes to be accomplished; and the admission by the accused that he sought to convert the certificates without any attempt to follow the only path which was left open after "C" day.

Because I believe there is a fundamental problem improperly answered by my associates, I prefer to approach the critical issue from a different standpoint. In occupied countries, it becomes necessary to issue temporary money, and the Government must use rapid methods of conversion to escape paying a heavy penalty to counterfeiters and

black market operators. It must be able to legalize one series of money equivalent contemporaneously with the outlawry of another. To me, the Army Regulations are drafted to do just that, and they are clear and specific to the effect that when the word is spoken, transactions of every type with the outlawed money are prohibited. The old certificates are frozen in place, and only dealings with the new currency are permitted. That is the only feasible means by which unlawful trafficking can be controlled. Of course, in that method of exchange, it must be realized that some individuals are going to be separated from their money when the freeze is ordered and hardship will result to them if a scheme is not devised to permit them to be subsequently reimbursed for the certificates which have been outlawed. In this instance, the plan or scheme involved a tightly managed conversion after "C" day. Subsequent to that date, the means of conversion depended on the lapse of time, and the time periods were shown by the official documents and testified to by a finance officer. The portion of time of importance in this instance was the first five-day division after the conversion day. That period of time was marked off for those persons who could establish unusual reasons for their failure to convert on "C" day. It was not intended that exchanges amongst individuals, or transactions between possessors and others, were to be legalized; the extension was only to allow those who owned and held certificates on the cutoff date to save themselves from loss due to conditions over which they had no control. It is crystal clear the accused was not in that category, for it was incumbent upon one who sought to convert during that period to show unusual circumstances and have his application for conversion authenticated by his commanding officer. So far as this record appears, those steps were not taken by the accused, and for good and sufficient reason. At best, his circumstance was only unusual in that it was illegal, and obviously he would not seek authentication of his venture with his conspirators. In summation, reason,

purpose, construction, and logic argue against an interpretation which reaches a conclusion that because the Government authorizes the new series of money to be accepted as a medium of exchange, it merely forbids the use of the old series to the same extent. Certainly, if transactions such as those are not prohibited, then the evil sought to be prevented, namely, loss to the Government, cannot be avoided.

It is argued that it could not have been intended by the Government to cut off all transactions with the old certificates, because to do so would make perfectly innocent acts unlawful. To do that, so the argument goes, would be making a crime out of conduct absent any criminal intent. To support the argument, some illustrations are offered. It is said the accused could have accepted the money as a gift; he could have converted legally had he used a prescribed method; or, he could have acted innocently as the agent for the true owner. Those illustrations lead us nowhere and could be demolished by saying we are not presented with any comparable hypothetical case; but if it is intended by such hypothesis to suggest that the Government must prove some mens rea, I would concur with that suggestion. However, the necessary criminal intent is established beyond dispute in this instance. Accused himself furnishes the testimony to show that his possession and attempted conversion were not innocent. Whether, in order to control counterfeiting or illegal use of temporary money, the Government can make the mere possession of an outlawed medium of exchange a crime, I need not determine. However, it is my conviction that in foreign countries, if conditions dictate, it can proscribe the circulation of a medium of exchange and demand its recall or conversion. If it seeks to regulate or eliminate a series of military payment certificates and promulgates regulations for those purposes, one who takes the forbidden currency, or attempts to convert it to legal tender contrary to the regulations, and under circumstances which show a guilty mind, can be brought to bar and his conviction sustained.

If, to avoid a charge of confiscation, the Government provides a means of processing later cases involving exceptional circumstances and one claims he is in that category, the burden is on him to come forward and raise reasonably an issue that he is within the excepted class. That issue is not raised in this instance, and no other reason appears of sufficient merit to justify a reversal of all the findings and sentence.

In the interest of completeness, I should perhaps mention accused's contention that the law officer erred in not striking witness Powell's testimony that he had given the accused $1,000.00 in military payment certificates. The basis for the motion to strike was that the answer was incriminating. The contention can be answered by merely stating that the privilege is personal to the witness and should be claimed before the incriminating testimony is divulged. In the event the witness neglects to exercise his privilege, the accused is not in a position to complain.